# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## CHESAPEAKE AND POTOMAC TELEPHONE COMPANY OF VIRGINIA V. COMMONWEALTH OF VIRGINIA.

### January 20, 1927.

1. STATE CORPORATION COMMISSION—*Fixing Rates of Public Utilities— Constitutional Power.*—The rate-making power of the State Corporation Commission is conferred by the Constitution, and as to the rates of transmission (telephone) companies, its jurisdiction is paramount, and can neither be limited nor curtailed by the General Assembly.   Const. section 156 (b).

2. STATE CORPORATION COMMISSION—*Fixing Rates of Public Utilities— Hearing—Evidence.*—The action of the State Corporation Commission in prescribing future rates for public utilities is a legislative function and the Commission is not limited in its consideration and determination of such cases precisely as it would be if it were a court which has no rate-making or legislative power.

3. STATE CORPORATION COMMISSION—*Fixing Rates of Public Utilities— Discretion—Hearing—Evidence.*—The action of the State Corporation Commission in fixing rates of public utilities being legislative, it is vested with a fair discretion to determine the ultimate fact in issue— that is, the precise rate to be prescribed as reasonable and just in the particular case, and this though the Commission must consider and certify the evidence, and its action will be reversed if it disregards the evidence.

4. STATE CORPORATION COMMISSION—*Fixing Rates of Public Utilities— Present Value of Property.*—Present value of the aggregate property of large public service corporations is not susceptible of measurement, nor can it be accurately calculated by mathematical formula, but it must be deduced from ascertainable facts (many of them ascertainable only by deduction) which either enter into present value as factors of varying weight, or have evidential value of varying weight, tending to show what is the present value of the aggregate property.

5. STATE CORPORATION COMMISSION—*Fixing Rates of Public Utilities— Reproduction Cost—Book Costs.*—Neither historical book costs nor theoretical reproduction new costs under wholesale construction within an assumed construction period, nor estimated cost of reproduction new under piece-meal construction in accordance with the

company's construction history (commonly referred to as book costs appreciated to reflect current labor and material prices), is of itself present value, or a measure thereof; and though all may be of evidential value in determining present value, if any of them be taken as a base from which to deduce present value, they must, to secure a result of approximately present structural value, be subjected to such modifications as other pertinent factors may require.

6. STATE CORPORATION COMMISSION—*Fixing Rates of Public Utilities—Basis of Valuation—Telephone Company—Case at Bar.*—In the instant case the method of the State Corporation Commission in deducing the present value of the property of a telephone company for rate-making purposes was upheld on appeal.

7. STATE CORPORATION COMMISSION—*Fixing Rates of Public Utilities—Protection of the Public Utility.*—The fact that the Commission must afford a hearing to the public utility, weigh the evidence, and have its conclusions subject to review by the Supreme Court of Appeals, insures the public service corporations against ill-considered and hasty action. Such proceedings have generally proved to be sufficient to preserve and safeguard all property rights in the State tribunals.

8. STATE CORPORATION COMMISSION—*Fixing Rates of Public Utilities—Evidence—Deductions of Witnesses.*—The deductions of witnesses from the facts shown are not facts proved which bind the Commission. These deductions are opinions, not facts, and the Commission may make its own deductions, which, however, should stand the tests of reason.

9. STATE CORPORATION COMMISSION—*Fixing Rates of Public Utilities—Valuation Necessarily an Opinion.*—The present valuation of a public utility as a basis for rates is of necessity and always a mere opinion, and never a fact which can be demonstrated. Such opinions are mere estimates, and to accept them as controlling would be destructive of public regulation and substitute the opinions of witnesses for the judgment of the tribunal appointed by law to weigh the evidence and pronounce the conclusion.

10. STATE CORPORATION COMMISSION—*Fixing Rates of Public Utilities—Valuation—Weight of Testimony of Experts.*—While the courts pay respectful attention to the estimates of experts as to the value of the property of a public utility, as the best obtainable guide, they decline to accept such estimates as controlling.

11. APPEAL AND ERROR—*State Corporation Commission—Discretion—Fixing Rates—Duty of Appellate Court.*—The rate-making power is a legislative power and necessarily implies a range of legislative discretion. The appellate court does not sit as the board of revision to substitute its judgment for that of the legislature, or of the Commission lawfully constituted by it, as to matters within the province of either.

12. APPEAL AND ERROR—*Appeal from an Order of the State Corporation Commission Fixing Rates of a Public Utility—Opinion of Commission a Part of the Record.*—Under section 156 of the Constitution of 1902 the opinion of the State Corporation Commission is a part of the record which the Supreme Court of Appeals must consider on appeal from an order of the Commission fixing the rates of a public utility.

13. APPEAL AND ERROR—*Appeal from an Order of the State Corporation Commission Fixing Rates of a Public Utility—Weight of Judgment of the Corporation Commission.*—Under section 156 of the Constitution of 1902, on appeal from an order of the Corporation Commission fixing the rate of a public utility, the action of the Commission appealed from is to be regarded as *prima facie* just, reasonable and correct. To their findings, then, must be ascribed the respect due to the judgments of a "tribunal appointed by law and informed by experience."

14. STATE CORPORATION COMMISSION—*Fixing Rates of a Public Utility—Valuation of the Property of a Telephone Company—Land not Used for Telephone Purposes.*—In valuing the property of a telephone company to obtain a basis for fixing the rates to be charged by the company, land not used for telephone purposes, though the company contemplated ultimately using the land for such purposes, was properly excluded, where the land was rapidly increasing in value and was no financial burden.

15. STATE CORPORATION COMMISSION—*Fixing Rates of Public Utilities—Valuation of the Property of a Telephone Company—Second Hand Material Used in the Plant.*—In a study of the cost of the reproduction of a telephone plant, to determine a rate basis, material which has been used, salvaged, or is second hand, should not be estimated to be of equal value with similar new material.

16. STATE CORPORATION COMMISSION—*Fixing Rates of a Public Utility—Valuation of Property of a Telephone Company—Allowance for Deterioration.*—In valuing the property of a telephone company in order to determine the rate base, deduction only for the observed and observable physical deterioration of the plant is not enough, there should be a further deduction based upon wear and tear, obsolescence, or inadequacy, resulting from age, physical change or supersession by reason of new inventions and discoveries, notwithstanding the fact that such physical depreciation may not be presently observable.

17. STATE CORPORATION COMMISSION—*Fixing Rates of a Public Utility—Value of Telephone Property—Allowance for Contingencies.*—A telephone company in applying to the State Corporation Commission for an increase of rates submitted an accurate inventory of its physical property which was accepted by the Commission. In the company's valuation a gross charge of two per cent for omissions and contingencies was added to the inventory's valuation, but as this

allowance for contingencies had been added to the several items, the valuation should not have been appreciated to that extent, nor should the two per cent have been applied to land and buildings.

18.   State Corporation Commission—*Fixing Rates of Public Utilities— Valuation—Going Concern.*—There is an element of value in an assembled and established plant, doing business and earning money, over one not thus advanced.   This element of value is a property right and should be considered in determining the value of the property upon which the owner has a right to make a fair return when the same is privately owned, although dedicated to public use. A public utility is entitled to have its going concern value estimated, if possible, to be included in the valuation of its property for rate-making purposes.

19.   State Corporation Commission—*Fixing Rates of Public Utilities— Valuation of Property of Telephone Company—Going Concern—Case at Bar.*—In the instant case, an appeal from an order of the Corporation Commission fixing the rates to be charged by a telephone company, two witnesses for the company estimated the going concern value of the company, one at $2,505,283 the other at $1,923,000, while the Commission allowed only $600,000.   The telephone company was a subsidiary of the Bell System and for that reason the Commission thought that its going concern value was not as much as it would have been if it had been an independent concern.

*Held:*   That the Commission did not err in this respect.

20.   State Corporation Commission—*Fixing Rates of Public Utilities— Value of Property of Public Utilities—Intercorporate Relations of a Telephone Company—Case at Bar.*—In the valuation of the property of a public utility to determine a rate basis in addition to investment cost, reproduction values, less depreciation, and going concern value, all other relevant facts should also be considered in order to reach the ultimate figure, and among these relevant facts are the intercorporate relations of a telephone company with the Bell System.

21.   State Corporation Commission—*Fixing Rates of Public Utilities— Value of Property of Public Utilities—Intercorporate Relations of a Telephone Company—Case at Bar.*—In valuing the property of a telephone company for the purpose of determining a rate basis, the fact that the company was a member of the Bell System, which owned the stock of the company, imposed certain burdens upon it and took the cream of its business for itself, is a fact to be taken into consideration, as also undisclosed advantages and pecuniary profits to the Bell System as the owner of the stock.   These intercorporate relations are relevant not only to determine the going concern value as part of the rate base, but also to ascertain whether the rate of return to the owner is just and reasonable.

22.   State Corporation Commission—*Fixing Rates of Public Utilities—*

Syllabus.

*Value of Property of Public Utilities—Intercorporate Relations of a Telephone Company—Case at Bar.*—In fixing the rate base or value for a Virginia telephone company as a separate entity, including its going concern value, the subserviency of the Virginia company to the Bell System, the profits produced, and the services performed by the Virginia company for the Bell System as its stockholder and owner, are all relevant facts for consideration. If considered as a separate entity the going concern value of the Virginia company is diminished because it has neither power of independent action nor revenue derived from its interstate business to which its property is devoted, except such as is allowed to it by the Bell System.

23. STATE CORPORATION COMMISSION—*Fixing Rates of Public Utilities—Telephone Company—Case at Bar.*—In the instant case rates prescribed by the Corporation Commission for a telephone company were estimates to produce more than six per cent upon its investment. In addition to this return the owner of the stock of the telephone company profited substantially from additional benefits received by it through the telephone company. The company contended that it was entitled to eight per cent upon the rate base.

*Held:* That there is no guarantee of eight per cent to investors in public utilities; and that, under the circumstances of the instant case, the rate fixed by the Commission was fair.

24. STATE CORPORATION COMMISSION—*Fixing Rates of Public Utilities—Valuation—Consideration of Interest Rates at which Capital can be Obtained.*—In valuing the property of a public utility for rate-making purposes the rate of interest at which capital could be obtained by corporations of secure financial credit is a circumstance to be considered.

25. STATE CORPORATION COMMISSION—*Fixing Rates of Public Utilities—Unreasonable Rates—Burden of Proof.*—The burden of proof of showing that the rates fixed by the State Corporation Commission for a public utility are unreasonable rests upon the corporation.

26. TELEGRAPHS AND TELEPHONES—*State Corporation Commission—Order of Commission Fixing Rates of Chesapeake and Potomac Telephone Company of Virginia, entered July 31, 1926.*—The rates prescribed for the Chesapeake and Potomac Telephone Company of Virginia, by the order of the State Corporation Commission of July 31, 1926, are not confiscatory and are believed to be just and reasonable. There is nothing irrevocable, however, about such a conclusion, for such rates are never permanently fixed, but are always subject to revision. If after a fair trial they prove to be inadequate or unjust, the question can be again reopened before the Commission without difficulty.

Appeal from an order of the State Corporation Commission.

*Affirmed.*

The opinion states the case.

*John S. Eggleston* and *Tazewell Taylor*, for the appellant.

*John R. Saunders, Attorney General, Leon M. Bazile* and *Lewis H. Machen, Assistant Attorneys General*, for the Commonwealth.

PRENTIS, P., delivered the opinion of the court.

The Chesapeake and Potomac Telephone Company of Virginia, duly organized under the laws of this State, hereinafter called the Virginia company, owns and operates telephone lines and exchanges with the necessary equipment in Virginia, and is engaged in supplying telephone service, both exchange and toll, within, and through its connections without, the State. On June 30, 1925, it filed with the State Corporation Commission schedules of increased rates, tolls and charges, to become effective August 1, 1925, alleging that the existing rates were unreasonable, confiscatory and inadequate to pay the operating expenses and a fair return upon the value of its property. The Commission suspended the operation and effective date of such increased rates, pending an investigation into their reasonableness, and directed a public hearing thereon. This hearing began November 22, 1925, and continued from time to time thereafter until July 2, 1926. The final order was entered July 31, 1926.

The record is voluminous, consisting of over three thousand pages of evidence and 269 exhibits therewith,

but we are much aided in our comprehension of the case by the comprehensive briefs and the full abstracts of the testimony which have been filed by the opposing counsel.

Had the proposed increases in the rates been effective for twelve months preceding May 31, 1926, the gross revenue would have increased approximately $770,027, and the net $609,774. The Commission refused to allow most of these increases, but did allow some of them, the effect of which it is estimated would, during the same period, have approximately increased the gross revenues of the company $225,695, and the net $175,047.

From this final order of the Commission this appeal is taken.

There are twenty assignments of error. The first two are thus stated:

"1. The Commission erred in holding, and proceeding upon the theory, that in this case it was 'exercising a legislative discretion, to be exercised with much the same latitude as to nature and source of information upon which it is based as is applicable to a State legislature, legislating with reference to rates where not prohibited from so doing by constitutional provision; and may consider not only such evidence as is introduced before it, but may base its action upon its own investigation of the facts, and make use of its own knowledge and experience and business judgment and all other sources of information available to it.' "

"2. The Commission erred in basing its findings and order, in whole or in part, upon its own investigation of facts or evidence, outside of the record made before it in this case."

[1] It is difficult, perhaps impossible, to define the rate-making power of the Virginia Commission in a

stated formula which can always be applied. It is con-
ferred by the Constitution, and as to the rates of trans-
mission (telephone) companies, its jurisdiction is para-
mount, and can neither be limited nor curtailed by the
General Assembly.    Const. section 156 (b).    It is
true that the Constitution requires the Commission,
before prescribing the rates of such public service
corporations, to give notice and to proceed strictly in
accordance with the rules of judicial procedure, and
there is an appeal of right to this court.    The purpose
of these provisions was to require a judicial investiga-
tion in advance, out of respect for vested rights and in
order to avoid subsequent litigation—that is, another
judicial inquiry after the rates had been so prescribed.
It was by the Convention supposed that such pro-
ceedings would safeguard every right, provide due
process of law in the State tribunals, and afford an
ultimate appeal from this court to the Supreme Court
of the United States under the judiciary act; and
hence that the orders of the Commission could never
be reviewed in the inferior Federal or State courts.    In
the case of *Prentis* v. *Atlantic Coast Line R. Co.*, 211
U. S. 210, 29 S. Ct. 67, 53 L. Ed. 150, however, the
Supreme Court of the United States, construing the
State Constitution, held, notwithstanding all of these
safeguards and the prevision so required of the State
authorities in such cases, that nevertheless the pre-
scribing of rates for the future is so essentially a
legislative function that such action prescribing rates
could be thereafter assailed in the inferior Federal
courts, and that the prescribing of such rates under
those provisions of the State Constitution were, in legal
effect, not a judicial determination of rights, but were
in effect mere legislative action.    To emphasize these
conclusions, the court added that even after a review

of such proceedings before the Commission on appeal by this court, the order here would still be legislative in character, and hence subject to attack in the Federal courts, just as if it were an act of the General Assembly, alleged to be unconstitutional.

[2, 3] The action of the Commission being so clearly legislative, it would be illogical and inconsistent to hold that the Virginia Commission is limited in its consideration and determination of such cases precisely as it would be if it were a court which has no rate-making or legislative power.   The action of the State, through the Commission and this court, in such cases, being held by the Supreme Court of the United States to be legislative action merely, of course certain consequences follow therefrom.   There can be no doubt whatever that the Commission must consider and certify the evidence, and its action will be reversed by this court if it disregards the evidence.   It must weigh and interpret the evidence, but is vested with a fair discretion to determine the ultimate fact in issue—that is, the precise rate to be prescribed as reasonable and just in the particular case.   The quoted statement of the Commission as to its mental processes, while it may be subject to some criticism, when it is considered in connection with the evidence submitted and the painstaking review of it in their opinion, presents no sufficient reason for reversing their conclusions.   These statements in their opinion as to their mental attitude are above criticism:

[4] "Present value of the aggregate property of large public service corporations, such as that of the Chesapeake and Potomac Telephone Company of Virginia, is not susceptible of measurement, nor can it be accurately calculated by mathematical formula, but it must be deduced from ascertainable facts (many of them

ascertainable only by deduction) which either enter into present value as factors of varying weight, or have evidential value of varying weight, tending to show what is the present value of the aggregate property.

[5] "Neither historical book costs nor theoretical reproduction new costs under wholesale construction within an assumed construction period, nor estimated cost of reproduction new under piece-meal construction in accordance with the company's construction history (commonly referred to as book costs appreciated to reflect current labor and material prices), is of itself present value, or a measure thereof; and though all may be of evidential value in determining present value, if any of them be taken as a base from which to deduce present value, they must, to secure a result of approximately present structural value, be subjected to such modifications as other pertinent factors may require."

[6] "In deducing from the evidence the present value, as of May 31, 1926, of the property of the telephone company, used and useful in the performance of its public service functions, the Commission has proceeded as follows:

"1. It has deduced an approximation of the structural value of the company's physical plant, used and useful, as of December 31, 1924, from estimates of reproduction new costs.

"In doing this, except as to 'land,' 'buildings' and 'right of way,' it has used as its working basis Robinson's estimate of reproduction new cost, as set forth and broken up in exhibits 216 and 222, into (a) construction which would be done under contract by the Western Electric Company, and (b) construction which would be done by the company itself. (See also exhibit 12.)

"Its treatment of 'land,' 'buildings' and 'rights of way' and all plant accounts will appear from what follows in the opinion.

"2. It has been deduced from book costs and the witness Gretz's book costs appreciated on approximation of the structural value of the company's physical plant, used and useful, as of December 31, 1924; using the same depreciation percentages of all kinds which it derives in the derivation of structural value from reproduction new estimates.

"3. To each of these, (1) and (2) above, it has added net additions from December 31, 1924, to May 31, 1926, as shown by the company's testimony, less a deduction for the proper difference in price of new and 'used' materials.

"4. To each of the results thus obtained it has added the same allowances for 'working capital' and 'going concern value,' and considering both the results so obtained in the light of the facts relevant to value as disclosed by the evidence, and realizing that it is impracticable to calculate by any method an absolutely exact valuation of a property such as this, it finds $19,000,000 as the fair present value, as of May 31, 1926, of the property of the Chesapeake and Potomac Telephone Company of Virginia, used and useful in the performance of its public service functions."

[7] The fact that the Commission must afford a hearing to the public utility, weigh the evidence, and have its conclusions subject to review by this court, insures the public service corporations against ill-considered and hasty action. Such proceedings have generally proved to be sufficient to preserve and safeguard all property rights in the State tribunals.

[8] It is not true, as seems to be argued by the learned counsel for the appellant, that the deductions

of witnesses from the facts shown are facts proved which bind the Commission. These deductions are opinions, not facts, and the Commission may make its own deductions, which, however, should stand the tests of reason.

The other eighteen assignments of error present in varying form questions which may be thus summarized: It is claimed that the Commission erred in determining as the rate base that the present fair value of the Virginia company's property, used and useful, in the performance of its public service functions and duties, including working capital and going concern value, as of May 31, 1926, was approximately $19,000,000 instead of approximately $24,000,000, and in prescribing certain rates which it is estimated will yield net returns thereon of six and one half per cent per annum, instead of eight per cent per annum; and that the rates prescribed are confiscatory.

[9] The case presents all of the difficult questions which are usually presented when commissions and courts undertake to ascertain present value as the basis for the rates of public utilities. The books afford abundant evidence of these uncertainties and perplexities. Such value is of necessity and always a mere opinion, and never a fact which can be demonstrated. Even where there is a single item of property to be valued, opinions, expert and inexpert, generally differ. When the property of a public utility is to be valued, these differences are greatly multiplied in proportion to the extent and variety of the several items of property. The margin of uncertainty is always relatively large. The efforts of the valuation experts to simplify the question are vain. Such conflicting opinions are always and essentially mere estimates. They cannot by formulas be transmuted into

facts.   Most informing and helpful they may be, but to accept them as controlling is destructive of public regulation, and substitutes the opinions of the witnesses for the judgment of the tribunals appointed by law to weight the evidence and pronounce the conclusion. Unless such conclusions are accorded great weight, then public regulation will become a mere gesture.

It is stated in *Louisville* v. *Cumberland Telegraph & Telephone Co.*, 225 U. S. 436, 56 L. Ed. 1152, 32 Sup. Ct. 742, with reference to such a valuation, that "when it is remembered what clear evidence the court requires before it declares legislation, otherwise valid, void on this ground, and when it is considered how speculative every figure is that we have set down with delusive exactness, we are of opinion that the result is too near the dividing line not to make actual experiment necessary."

[10] That the courts, while paying respectful attention to the estimates of these experts, as the best obtainable guide, have even in three cases which are relied upon by the appellant declined to accept as controlling the "delusive exactness" of estimates similar to those relied upon by the appellant here, is apparent. In *Missouri, ex rel. S. W. Telephone Co.* v. *Public Service Commission of Missouri*, 262 U. S. 276, 67 L. Ed. 981, 43 S. Ct. 544, 31 A. L. R. 807, the company "proved" (if such estimates of value can be fairly called proof) that the physical property of the telephone company there had a reproduction cost new, as of June 30, 1919, of $28,454,488; working capital $1,051,564; establishing business, $5,594,816; total $35,100,868.   After deducting estimated depreciation, they valued the physical telephone property at $24,-709,295; working capital, $1,051,564; establishing business $5,594,816; total $31,355,675.   Notwithstanding

this collection of apparently exact figures, about which there was little contradiction, the court in deciding the case held that for the purpose of that case the valuation should be at least $25,000,000—that is, it reduced the value, as estimated by experts and claimed by the company, over $6,000,000.

In *McCardle* v. *Indianapolis Water Co.*, 47 S. Ct. 144, 71 L. Ed., the utility, a water company, undertook to show that the reproduction cost, less depreciation, at existing prices, was, as estimated by the experts, more than $22,500,000; but the court in disposing of the case held the value of the property to be not less than $19,000,000, and allowed the company rates estimated to earn seven per cent upon that reduced value.

In *Chesapeake & Potomac Telephone Co. of Baltimore* v. *Whiteman*, 3 Fed. (2) 938, the U. S. District Court, three judges present, Rose, circuit judge, delivering the opinion, the company supplying service in Maryland undertook to show by one expert that the reproduction value of its property, less depreciation, was $38,315,153, and by another (the same Mr. Robinson who testified in this case) $42,841,110; but in an elaborate opinion, holding that the Maryland Commission had underestimated the value of the property, the court, after a full and philosophic review of the testimony, said: "The evidence offered by the company has failed to convince us that its plant, as it stands today, is worth more than it would cost new, less the amount now to the credit of depreciation account;" and held that for rate-making purposes the value of the property, less depreciation, was $29,507,-949, and that the company should have permission to charge rates which would produce, at the minimum, six per cent on such fair value of its property at that time used or useful in the telephone service.

[11] In every such case, courts should observe the caution indicated by the Supreme Court of the United States thus expressed in the *Minnesota Rate Cases*, 230 U. S. 433, 33 S. Ct. 754, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18: "The rate-making power is a legislative power and necessarily implies a range of legislative discretion. We do not sit as a board of revision to substitute our judgment for that of the legislature, or of the Commission lawfully constituted by it, as to matters within the province of either. *San Diego Land & Town Co.* v. *Jasper*, 189 U. S. 439, 446, 47 L. Ed. 892, 896, 23 Sup. Ct. Rep. 571. * *"

[12, 13] We shall not undertake to review in detail all of the mass of evidence which is before us. The Commission has done this in an elaborate and careful opinion, which shows that they weighed the evidence and studiously considered every question presented. Whether every one of their conclusions is justified in every respect we shall not undertake to say, but will content ourselves with such references to a few of them as seem to us to be appropriate, and in general terms refer to the ultimate figures relating to costs, to values as estimated by the experts, and to our conclusions therefrom. In so doing we shall bear in mind our own jurisdiction as conferred by Constitution, section 156, especially clause "f" of that section, which provides among other things: "The Commission shall, whenever an appeal is taken therefrom, file with the record of the case and as a part thereof a written statement of the reasons upon which the action appealed from was based, and such statement shall be read and considered by the appellate court upon disposing of the appeal." So that the opinion of the Commission is a part of the record which this court must consider. The sub-

section (f) proceeds: "The appellate court shall have jurisdiction on such appeal to consider and determine the reasonableness and justice of the action of the Commission appealed from, as well as any other matter arising under such appeal; provided, however, that the action of the Commission appealed from shall be regarded as *prima facie* just, reasonable and correct." To their findings, then, must be ascribed the respect due to the judgments of a "tribunal appointed by law and informed by experience." *Ill. Cent. R. R. Co.* v. *I. C. C.*, 206 U. S. 441, 27 S. Ct. 700, 51 L. Ed. 1128.

Referring to the opinion, we observe this: That the Commission finds that the Virginia company, as a subsidiary of the American Telegraph and Telephone company, hereinafter called the American Company, or the Bell System, is giving a high grade of telephone service, which they are constantly seeking to improve; and are performing a service which has become an economic and social necessity to the people of Virginia with which they cannot dispense.

[14] Among the items of property which the company claims should be included in the rate base is a valuable lot upon the corner of Seventh and Grace streets, Richmond, which was purchased three years ago, on December 4, 1923, at a total cost of $286,475.33. This area, excepting a small strip used as an alley, is not now used for any telephone purpose. Part of it is occupied by old residences, and part of it is vacant. The estimate of the present value of this particular lot, exclusive of the use of the alleyway, by a witness for the company, is $319,185.50, and by another expert witness a larger amount. The company contemplates ultimately using this property for telephone purposes. It is adjacent to a valuable building heretofore constructed and now so used. It is said that the company will

probably start with that project within the next two years.  The forethought which led to the purchase of that property is commendable, but it is no financial burden, for it is shown to be rapidly increasing in value.  We think that the Commission did not abuse its discretion in holding that this property is neither used nor useful in the public service, and, therefore, that its cost should form no part of the present rate base. To hold otherwise would be to charge the public with rates based thereon.  It must have some annual value, and the additional profit to the company from its rapidly increasing fee simple value is surely sufficient immediate reward to the company for its foresight. It has no proper place in the rate base valuation upon which the company is presently entitled to receive additional rates from the public for telephone service. The Commission has, therefore, deducted the price of this property from the estimated rate base.

For similar reasons, the value of a lot at Hampton, which was bought during the World War, which has never been used, and which there is no intention of using for at least five years, valued at $2,500, has been deducted; and also a lot at Norfolk, valued at $8,000, upon which there is a very small house of insignificant value, covering little of the lot, and used for some telephone purpose.  This lot is being held as a site for an exchange, to be built in the indefinite future.  That these deductions, aggregating $197,925, made from the rate base claimed by the company, afford slight ground for criticism, seems to us evident, especially in view of the meticulous care with which the company has listed and appreciated every other item of its property.

[15] Another reduction made by the Commission is for salvaged and second hand material now used in the

plant.   It is shown that an appreciable part of the material which has been used in the plant is material which at the time of its installation had previously been used, had been salvaged and was second hand. The practice of the company seems to be, that when it is found necessary to remove a pole, or a switchboard, or any other physical property, because of the wear and tear and obsolescence, it is removed and its salvage value estimated.   Then it is reconditioned (in the case of poles by cutting off the decayed bottom) and replaced where needed at the price of new material of that kind.   The Commission holds, and we think with good reason, that however wise this re-use may be, and it certainly is wise, such reconditioned material, even though it may be efficient for the time being, should not in estimating reproduction values be listed at the price and value of new material, but should be subject to some fair deduction resting in judgment. We believe in a study of the cost of reproduction of such a plant, material which has been used, salvaged, or is second hand, should not be estimated to be of equal value with similar new material.

[16]   The company, in its valuation study, deducted only for the observed and observable physical deterioration of the plant units which are in place, while the Commission was of opinion that there should be a still further deduction based upon wear and tear, obsolescence, or inadequacy, resulting from age, physical change or supersession by reason of new inventions and discoveries, notwithstanding the fact that the physical depreciation may not be presently observable.   Of course, it is quite difficult to estimate the depreciated value of such reused or long used material, which appears to be serving its purpose; but that such depreciation should have a place in an estimate of the repro

·duction cost, less depreciation, there seems to us to be no doubt whatever. That the Commission did not abuse the discretion in insisting upon some deduction for this unobservable depreciation seems clear.

It is shown in this connection that there are frequent changes, improvements and economies in telephone materials. For example, it is proved that cable put in the plant in 1917 at a cost of $40 per mile per pair of wires, could have been replaced in 1924, in spite of increased cost of labor and materials, by a different type of cable carrying a large number of smaller wires, at about $12.50 per mile per pair of wires.

There are various estimates, percentages, loadings and incidentals which are included in the total valuation claimed by the company. That some of these additions to the physical values are proper, and that no other sensible way has yet been devised for the estimation of the ultimate fact, that is, present value, may be true. There is, however, little reason for the harsh criticism of the Commission because it was unwilling to accept all these estimates as conclusive. The application of such estimates to the facts proved rests in a sound, fair judgment, and the conclusions of the Commission are not to be lightly set aside in favor of the contrary judgment of the expert witnesses who admit that their estimates cannot be demonstrated, but rest upon their individual judgment.

[17] It is shown by the company that a most careful inventory of all of the physical property was taken, examined, tested and retested for accuracy, which inventory is accepted by the Commission. The opinion is expressed by the company's witness Robinson, that this inventory upon which his reproduction new study is based is a full, accurate inventory; that it is accurate within 3/10 or 4/10 of 1 per cent; and yet in

the company's valuation there is added a gross charge
of two per cent for omissions and contingencies. This
addition for "contingencies" (as said by Mr. Robinson)
is an allowance which "should be made in order to pro-
vide for those things which cannot be foreseen in esti-
mating the cost of work (and which are not apparent in
an inspection of finished work), but which are very real
items in the cost of all extensive construction pro-
jects. Contingencies appear in the form of disasters,
delays due to labor troubles, unforeseen circumstances
requiring a change in plans, failure of contractors,
unforeseen difficulties in excavation and similar items."
This seems to be quite reasonable on its face, but
when it is observed that all through these studies of
value these estimates and percentages have been added
to the several items to cover many of these very con-
tingencies, it may be well doubted whether the valua-
tion should be further appreciated to any such extent.
And certainly it seems carrying such deductions too
far when they are applied to land and to buildings
which have already been valued and loadings for all
such contingencies and omissions already added in
those particular estimates.

In its reproduction study and effort to establish the
highest possible value the company seems to have
omitted nothing, for there are the usual estimates for
administrative and legal costs, for insurance and taxes
during construction, for interest during construction,
etc., and the Commission seems to have agreed that
such additions to the physical value are proper, though
they did not always agree as to the precise amounts
of such additions.

What is called going concern value is another item
about which there are wide differences of opinion.

[18] In *Des Moines Gas Co.* v. *City of Des Moines,*

238 U. S. 165, 39 S. Ct. 815, 59 L. Ed. 1244, the Supreme Court of the United States says: "That there is an element of value in an assembled and established plant, doing business and earning money, over one not thus advanced, is self-evident. This element of value is a property right and should be considered in determining the value of the property upon which the owner has a right to make a fair return when the same is privately owned, although dedicated to public use."

That the company is entitled to have its going concern value estimated, if possible, seems to be established.

[19] The witnesses for the company, Robinson and Hagenah, estimated this going concern value, the one at $2,505,285, the other at $1,923,000; while the Commission, for reasons which it undertakes to justify and to which we shall refer, allowed only $600,000. But Hagenah says this about his own estimate: After having testified at length about the difficulties of estimating going concern value, he says: "These elements which I am discussing, which I say were brought out in the question of the Commissioner and by counsel, are not different from what arise in every public utility rate-making case. I have testified in many for the last fifteen years, and have been in most of the large public utility cases, and I say frankly I do not know how to measure going concern value. I can give you evidence of it, and then I can only have my own judgment, just as a court or just as a jury would do on any question of value; and commissioners have told me frankly, when they got through listening to the testimony, that they admit there is a substantial element of going concern value but they have never yet heard a line of evidence to prove it. Of course, there is no evidence to prove it and you can't prove the

measure of going concern value.   You can't prove the
value of an education in dollars and cents; you can't
prove the value of a great literary production; you
can't prove the value of a painting; you can't prove
the value of a concern's credit unless you go into all
the evidence, which men in their complex relationship
have come to accept as indications of value in their
intercourse with one another.   Is there this evidence?
Most commissions have taken the practical viewpoint:
'We will show a round sum.'   I don't know of any
better way in which we can solve that problem.   No
two commissioners will have the same idea, and any
Commission that does adopt that method will not have
the same per cent that the other gets, because conditions
differ.   I have with me a long list of decisions, and I
have no doubt this Commission has, which show what
other commissions have arrived at as a conclusion
after listening to testimony, and that has a tendency
to establish a measure of going concern value, although
it is not absolute proof of it.''

After stating that in the *Denver Water Case*, 246 U. S.
178, 38 S. Ct. 278, 62 L. Ed. 649, eight per cent was
found, the witness goes on:   "Some commissions have
allowed as much as eight per cent, in some instances,
yet there are many instances in which they have allow-
ed fifteen and twenty, and even more than twenty, per
cent, and no one has been aggrieved by it after an
analysis of the facts in the case.   I believe this Commis-
sion has found in a recent case in regard to a very large
property an allowance for going concern value of ap-
proximately fifteen per cent.   The average of practically
all, at least as far as I know, of the conclusions of com-
missions on the subject of going concern value is some-
where around ten or eleven per cent, and that percent-
age is applied to what they say is the fair value of the

physical property.  The amount which I have included in my appraisal as going concern value is ten per cent of the reproduction cost of the property, less depreciation which I find, and that ten per cent is not applied on working capital; and by using ten per cent I think I have put myself squarely with the great majority and the average opinion of public service commissions on this line of practice.''

[20] It may be that the Commission, in estimating the going concern value of this utility, made too great a reduction, but this cannot be fairly decided without noting and weighing other relevant facts in the record. As has been so often said, there is no rule of thumb for ascertainment of such a gross value, but certain it is that in addition to investment cost, reproduction values less depreciation, and going concern value, all other relevant facts should also be considered in order to reach the ultimate figure.  *Simpson* v. *Shepard* (Minnesota Rate Cases), 230 U. S. 433, 33 S. Ct. 729, 57 L. Ed. 1555, 48 L. R. A. (N. S.) 1151, Ann. Cas 1916A, 18. Among these other relevant facts here are the intercorporate relations and unity of the American company, the Virginia company and a large number of other affiliated companies, known as the Bell System.  The American company owns all of the stock of the Virginia company, and through the medium of other corporations owned, controlled, or operated by it, has a dominating control of the telephone service here and elsewhere in the United States.  This control embraces not only the furnishing of telephonic communication, in which it operates over seventy per cent of all of the telephone stations in the United States, but also in the fields of telephone engineering and research work, ownership of patents under which telephone materials, supplies, apparatus and equipment are manu-

3

factured and used, and in the manufacture and sale of such telephone materials, supplies, apparatus and equipment to its associated compaines. It owns directly one hundred per cent of the stock of the following so-called inactive companies, which it uses to hold the equal title to its long distance lines, which it does not permit these subservient companies to operate, but operates itself: The American Telephone and Telegraph companies of Alabama, Arkansas, Baltimore (Maryland), Delaware, Georgia, Illinois, Indiana, Indian Territory, Iowa, Kentucky, Louisiana, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Pennsylvania, New Jersey, North Carolina, Rhode Island, South Carolina, Tennessee, *Virginia*, Wisconsin, West Virginia, Wyoming, The Colorado and Eastern Telephone and Telegraph Company, East Pittsburgh Telephone Company, The Kansas Telephone and Telegraph Company, The Ohio Telephone and Telegraph Company and the Columbia Telephone and Telegraph Company of Rhode Island. Through these companies it controls in the field of interstate communication. There are twenty telephone companies in the United States conducting exchange and interstate toll business, which are either state-wide or wider in their operations. In these twenty the American Company of New York owns one hundred per cent of the voting stock of ten, including the Virginia company, over ninety-eight per cent of six others, and smaller percentages of the remainder, but more than fifty-nine per cent of the stock of all except two. In addition to this dominating control, the American company owns, through holdings in its own name and those held in the name of the Western Electric Company, one hundred per cent of the capital stock of Bell Telephone Laboratories, Inc., Bell Securities Company and

o

205 Broadway Corporation, 99.99 per cent of the stock of Central Union Telephone Company, seventy per cent of 195 Broadway Corporation, fifty per cent of Cuban-American Telephone Company, and 32.09 per cent of Bell Telephone Company of Canada. It owns 98.34 per cent of the stock of the Western Electric Company, which is engaged in the manufacture and sale of telephone material, supplies, apparatus and equipment. The assets of this company approximate $200,000,000, and its annual sales approximate $300,000,000. In 1924, the last figures available to us at this moment, found in the Commission's opinion, the total sales were $298,000,000, of which it sold to the Bell System, $233,000,000.

It is said in the 1921 annual report of the American company, that "the closest co-operation through more than a generation has made the Western Electric Company virtually a department of the Bell System, exercising the functions of manufacturer, purchasing agent and storekeeper. * * The relation which has grown out of the contract and financial interests established in 1882 has, therefore, provided for the Bell System a controlled source of supply of the apparatus and materials needed in the construction, maintenance and operation of its plant."

In 1924 Mr. W. S. Gifford, president of the American Telephone and Telegraph Company, says this of the Bell System: "The Bell System is made up of a number of associated telephone companies. In effect you might consider it as one institution and one company. Due, however, to State laws, the different local conditions in the United States, the business is carried on through corporate organizations comprising a parent company, which is the American Telephone and Telegraph Company, a number of associated companies,

which do the telephone operating in different sections of the country, and the Western Electric Company, which manufactures telephone equipment and is the supply department of the entire system.

"Now, we do not actually operate, or own, all the telephone business of the United States, although we own two-thirds of it. Substantially the remaining third is owned by what we call connecting companies. There are, it is true, a few places remaining in which there are competing companies."

In the annual report of 1923 it is said, among other things, indicating the essential unity and extent of control of the business (and included in this business is that part of it conducted through the agency of the Virginia Company), that "by virtue of stock ownership and contracts and the relations which grow out of them, the Bell System operates practically as a single organization offering telephone service to the people of this country without limitations of distance or property ownership."

In the 1925 report this is said by the president: "From its very nature, our business—the aim of which is to make inter-communication by telephone possible throughout the nation—requires an organization nationwide in its scope, organized and operated under State laws and State regulations, and Federal laws and Federal regulations. This, of course, necessitates an enterprise made up of corporations and subsidiary corporations. In short, it requires the sort of organization that is provided by the Bell System. Notwithstanding its many corporations and various intercorporate relations, it is quite simple in principle, and it is not arbitrary nor has it merely happened."

These quotations might be extended and the same idea repeated, but the fact that not only through stock ownership, but also through the organization described,

the American company directly controls all the operations of the Virginia company, is unquestioned. The local company is a separate corporation. This is necessary under the Virginia Constitution, and there can be no just criticism of the Bell System because of this fact. Indeed, we do not mean by the recital of these facts to criticise the American company, the agreement, or the organization. So far as we know, this result has been honestly accomplished, and its great power has never been abused. It probably supplies and will continue to supply a telephone service to the people of this country which could not be as economically or as efficiently furnished by any other system. Our reason for emphasizing this complete subordination and dependence of the Virginia company upon the American company is because we believe that this constitutes one of the most significant and relevant facts necessary to be considered in order to determine the ultimate facts to be determined in this case, (a) the rate base, especially going concern value, as part thereof, and (b) a fair rate of return to the Virginia company viewed as a separate entity. This is neither to assail their agreements, nor to assert any control over them, nor to attempt either to annul or discredit them, but merely to scrutinize them and to recognize their significance as among the relevant facts of this case.

With this idea in mind, the Commission says this in the course of the discussion: "We are of opinion and so hold that the American Telephone and Telegraph Company of New York and its subservient operating, manufacturing, financing, engineering and research corporations, constitute one operating entity, and that to understand, or correctly determine, the actual costs and charges of the telephone service rendered by it in the State of Virginia, what are fair and reasonable rates to

be charged therefor, and the ultimate profits of the operating entity from the performance of its public service functions in the State of Virginia, it must be so viewed."

In the exercise of its unchecked control, the American company has what is called a "license agreement" with the Virginia company, which is the common standard intercompany working agreement of the American company with its subservient operating companies. It is insisted that all questions as to this license agreement have been concluded in favor of the company by the decisions of the Supreme Court of the United States. We do not so construe the cases relied on.

In *Houston* v. *Southwestern Bell Telephone Co.*, 259 U. S. 318, 42 S. Ct. 486, 66 L. Ed. 961, it was perfectly apparent from the evidence that the rates prescribed by the city of Houston, Texas, were confiscatory. What the court decided was that under a similar contract the twenty-five per cent of long distance toll revenue received from calls originating in Houston was reasonably sufficient for that service. The other point was this: It was contended by the city (the contract being substantially like the one here involved) that because no fair disclosure had been made by the companies furnishing the instruments and the materials and supplies, the company could not be heard in a court of equity, and that the case should be dismissed. What the court held was: "Under the circumstances disclosed in the evidence, the fact that the American Telegraph and Telephone Company controlled the company and the Western Electric Company by stock ownership is not important beyond requiring close scrutiny of their dealings to prevent imposition upon the community served by the company, but the court recognized and applied this rule. Here again the evidence introduced

by the city was meagre and indefinite, while that of the company was exceptionally full and complete;" so that the contention that the case should be dismissed on this ground was denied.

In the other case, *Missouri, ex rel. S. W. Bell T. Co.* v. *Public Service Commission*, 262 U. S. 2766, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807, the entire significance of the case is thus emphasized: "Obviously, the commission undertook to value the property without according any weight to the greatly enhanced costs of material, labor, supplies, etc., over those prevailing in 1913, 1914 and 1916. As a matter of common knowledge, these increases were large. Competent witnesses estimated them as forty-five to fifty per centum." In that case the Commission had excluded in its estimate of the company's expenses the four and a half per cent on the gross earnings paid to the American Telephone and Telegraph Company for rentals and services under the agreement, and this exclusion the court held to be improper. In this case the Virginia Commission has committed neither of these errors condemned in these cases.

Under that agreement the American company provides for the Virginia company:

"1. Telephone transmitters, receivers and induction coils, including a surplus supply.

"2. Rights of usage under all patents owned or controlled by the American company in the field of telephony.

"3. The right to use all standardized new and improved apparatus and methods developed by the American company or its subservients.

"4. A guarantee of freedom from royalties, damages and expenses on account of patents, arising out of use of apparatus, methods and systems recommended by the American company.

"5.   An organization to prosecute research and investigation in the art of telephony.

"6.   Advice and assistance in general engineering, plant traffic, operating, commercial accountings, patents, legal, administrative and other matters.

"7.   Advice and assistance in financing.

"8.   Assistance in establishing and maintaining a uniform fund for its and their employees.

"9.   The right to extend to connecting companies the benefit of such engineering and other technical advice and information as the licensee may receive from the American company.

"10.   It makes available to the operating companies apparatus, appliances, methods and systems embodying its inventions, discoveries and patents through the manufacture and sale of apparatus, etc., by its subsidiary, the Western Electric Company."

It is observed in passing that this paper is more in the nature of an edict or concession than an agreement. The Virginia company cannot assign, but the American company may relieve itself of all its obligations by assignment.   It provides for the things that the American company will do, ostensibly for the Virginia company, but in fact for itself, because everything that it does for the Virginia company it does in the promotion of its own interests, either as owner of the system, or as the sole owner of all of the capital stock of the Virginia company.   For these enumerated benefits so received by the Virginia company (if it be possible under these circumstances even mentally to separate the associated corporations completely), it has paid in the past to the American company, its owner, four and a half per cent of its total gross earnings, which in the early part of 1926 was reduced to four per cent.   In addition, however, to this considerable payment by the

Virginia company, as a consideration, it performs various services for the American company for which no corresponding pecuniary compensation has been specifically allotted to the Virginia company. Among these are, that it conducts the sale of the American company's stock and securities without charge; it pays the taxes on the receivers, transmitters and induction coils furnished by the American company; it supplies the American company, without specific remuneration, the use of all of its exchange plants for the handling of interstate messages and stipulates that the Virginia company shall collect and account to the American company for the toll service rates charged the exchange subscribers for the use of these long distance facilities; it grants the American company certain rights with respect to trunk lines from its exchanges to points outside of such exchanges, and the right to enter the offices of the Virginia company and to connect its lines with the lines of the Virginia company. The local company does construction and maintenance work for the American company and the American company for the Virginia company at labor and material cost plus eight per cent, which is lower by certain overhead loadings than the cost as carried to their own accounts; but approximately twice the amount of work appears to be done for the American company under this arrangement than for the Virginia company. For instance, in 1924, the Virginia company did $69,321 worth of construction for the American company, while the American company did $34,000 worth of construction for the local company. It grants to the American company the right to use its right of way without remuneration, though the Virginia company is required to pay for its use of the American company's right of way; it agrees that it will perpetually

do all its interstate business (except such as the American company may except) over the lines of the American company, and that it will not solicit or receive pay for transmission over other lines "unless compellable by law to do so;" and that it will permit the American company to route all interstate messages originating in the Virginia company's territory, as it may desire under the license agreement and its supplements. For originating—that is, outward bound interstate toll messages—the Virginia company receives an originating commission, but receives no commission whatever on incoming interstate messages which it handles, unless the commission on originating messages is held to be sufficient remuneration to it for both originating and terminating messages. In addition to the originating commission, the Virginia company receives a mileage prorate in certain excepted instances in which the American company permits it to route the message in whole or in part over the Virginia company's own lines, which, however, is not permitted when the American company has a line at the point of origin, or for any greater distance than is necessary to reach the nearest point at which the message can be transferred to the American company's lines. Since the hearings were begun before the Commission and after the introduction of evidence by the telephone company in support of the justness and reasonableness of the compensation and of these relations with the Virginia company as to interstate toll commission, the American company has increased these commissions and allotted to the Virginia company a slightly larger proportion thereof.

One result of the clause in the license agreement, or rather of the American company's mandate, giving to it the right to route interstate business as it sees fit, is

that although the Virginia company has a complete toll system covering the State of Virginia, reaching practically every section, the Virginia company's toll plant often remains idle while the message is communicated through Virginia over the American company's paralleling wires, the Virginia company receiving, if it is an originating message, only the originating commission, while if a terminating message, it receives nothing. The witness Clarkson testifies that what the Virginia company needs is more "toll traffic for we have an elaborate backbone plant."

The Virginia company has a line from Richmond to Alexandria, and the American company lines from Richmond to Washington. On messages from Richmond destined to Washington and beyond, the American company requires the Virginia company to put the message on the American company's wire at Richmond, instead of transmitting it over its own wire to Alexandria and there transferring it to the American company's wire. On a seventy-five cent message from Richmond to Washington, the Virginia company procures the business, supplies the exchange plant used at the Richmond end in transmitting the message, does all the operating, including the toll switching, all the bookkeeping and collecting, puts the message on the American company's wire at Richmond, whence it is transmitted to Alexandria on a circuit paralleling its own, and receives twenty-six and one-half cents as its total compensation, when, except for this license contract, it might have transmitted it over its own wire to Alexandria and received a large part of the residue as mileage prorate. On a message from Washington to Richmond, the message is transmitted to the Richmond exchange over the American company's wires, the Virginia company performs practically the same service, uses its

plant and operating force, but receives nothing. Messages originating in Alexandria, Va., destined to Bristol, Virginia (intrastate), are routed through Washington (interstate), from Washington to Lynchburg over the American company's line, from Lynchburg to Norton, Va., over the American company's line, and from Norton back via Abingdon to Bristol over the Virginia company's line, though the Virginia company has parallel circuits practically the whole distance. The result is that the Virginia company receives only an originating commission on a small mileage prorate instead of the whole toll charge.

That all relevant facts should be considered accords with and does not contravene any decision or expression of the Supreme Court of the United States.

The Commission holds, and we find little reason to doubt the soundness of the holding, that "there is much in the record to indicate that through the domination of its stock control, expressed through the medium of the so-called 'license contract' and its patent ability to enforce its every request, to say nothing of orders, with reference to the management of the Virginia company, the American company is placing on the Virginia company the burden of developing and carrying the unproductive toll lines, and as they become productive of interstate business, by purchase or use of these lines or circuits thereon, or placing thereon its circuits, is taking the cream of the business to itself, without having borne itself directly any part of the cost of carrying the lines while unproductive."

While the Virginia company has not introduced any testimony as to the actual earnings of the American company on the Virginia business, or as to its business as a whole, except such as can be approximated from the annual reports of the American company, it is apparent from these that the American company had net

earnings available for dividends in 1924 on its entire business of not less than $11.31 per share of its capital stock, and in excess of ten per cent since the beginning of 1920, exclusive of its right to the undivided profits and surplus of the Virginia company and of its other subservient companies. The figures given in these annual reports show that for 1924 its net income available for interest and dividends, from its whole interstate long distance business, was not less than 13.29 per cent of the book value of its plant used therein, and it would appear to be much larger.

In 1922 the president says: "While the average rate of return on the book cost of the associated companies was 5.6 per cent due to the conservative financial structure of the Bell System, with a return of only 4.7 per cent, the American Telephone and Telegraph Company would still have earned—but without any margin for surplus—its nine per cent dividends."

The American company has not, since 1914, paid less than eight per cent dividends, nor since 1922 less than nine per cent, and in addition has set aside substantial amounts for contingencies and surplus. In 1925 its net earnings available for dividends were $107,405,046, and after paying the nine per cent dividend set aside $6,-000,000 for contingencies, and carried $20,360,620 to surplus. To these great earnings the Virginia company has contributed its severable earnings plus the unascertained value of its other services to the system as one of its agencies.

The attitude of the American company is indicated by this quotation from a letter written February 8, 1921, by its president, to Mr. Berry, president of the Virginia company:

"We are going into the license contract more fully than usual, and I hope that what we say will serve as

an outline and a background for our presentation of the contract whenever we are called upon to discuss it. I am planning to tell the stockholders how much we receive in four and a half per cent revenue, and as nearly as we can estimate what it costs us. We have held back in giving that information directly to the commissions because we do not want to admit their right to that information and the consequent right of objection to any of the items, as obviously we cannot conduct those services subject to the control of forty commissions, but we have no objections to their knowing the facts. I am not proposing to state it each year, but I have the feeling that if we give that information once for all and remove the mystery connected with it, that it will go a long way towards silencing any question on that point. We are arguing for better earnings for the American Telephone and Telegraph Company."

That veil of mystery may have been slightly pushed aside, but has never been lifted, and the fair construction of the letter is that the American as owner (sole stockholder) of the Virginia company, derives a substantial profit directly from the separate operations of the Virginia and also from its co-operation as part of the system, including the profits produced through another subsidiary, the Western Electric Company.

So that there are distinct but undisclosed advantages and pecuniary profits to the owner of the stock and property of the Virginia company that are not reflected in the net earnings and dividends of the Virginia company which are paid directly to such owner. There is the profit from sales and services of the Western Electric Company to the Virginia company; there is the profit derived from the use of the facilities and agencies of the Virginia company as well as from the interstate business which the Virginia company

does in aid of and for the benefit of the American com-
pany. These profits cannot be stated. The facts upon
which some estimate thereof might be made are not
disclosed. Perhaps the complications are so great that
they cannot be determined accurately, but the fact
that they surely exist is as clear as any other fact in the
case.

[21] These intercorporate relations are relevant not
only to determine the going concern value as part of
the rate base, but also to ascertain whether the rate
of return to the owner is just and reasonable.

(a) Is it not apparent that whatever the going con-
cern value of the Virginia Company may be, it is
relatively less considered as a separate entity than if
it were an independent corporation. If it wished to
realize on this value by a sale, who would buy unless
assured of the friendly co-operation of and association
with the Bell System? Is not its going concern value,
great or small, however estimated, the joint estate of
the Virginia company and the American company, if
considered as separate corporate entities? If so, how
much of such value should be assigned to the Virginia
company as part of its rate base? Such questions may
be unanswerable, and this because there is but one
organization or entity in fact having any power of
action, and that is the American company. In this
view of the matter, while the Virginia company has
little separable going concern value, it has its due
proportion (whatever that may be) of the going con-
cern value of the Bell System. If that be very great
because of the association, there is nothing in the
record from which it can be even guessed at.

(b) Then, in considering whether the rates which
have been prescribed are reasonable and will produce
a just return, we must, under this record, conclude

that the owner of the stock of the Virginia company will receive directly the dividends which these rates will produce, and in addition thereto many other benefits and advantages of pecuniary value which certainly exist, but cannot be definitely determined. That the Virginia company is worth something to the American as its assured compulsory customer for materials and as its associate in business, which is in addition to the dividends to be produced by these rates, cannot fairly be doubted.

[22] Summing this particular matter up, it is not intended to claim that the Virginia Commission has the right to question or limit the profits of the American company, which is not directly a party to this proceeding, but nevertheless, in fixing the rate base, or value, for the Virginia company as a separate entity, including its going concern value, the subserviency of the Virginia company to the American company, the profits produced, and the services performed by the Virginia company for the American company as its stockholder and owner, are all relevant facts for consideration. If considered as a separate entity the going concern value of the Virginia company is diminished because it has neither power of independent action nor revenue derived from its interstate business to which its property is devoted, except such as is allowed to it by the American company. If considered as an agency or partner in the system, its going concern value may be great, but it is neither ascertained nor severable. The rate base, $19,000,000, as estimated by the Commission, may be too low, but let us consider the other estimates submitted by the company's witnesses.

These are the results of their appraisals:

|  | ROBINSON |  | HAGENAH |
|---|---|---|---|
| Reproduction cost new | $21,982,901 |  | $21,820,179 |
| Depreciation_____11.56% | 2,541,823 | 11.85% | 2,586,291 |
| Reproduction cost new less depreciation | $19,441,078 |  | $19,233,888 |
| Working capital | 575,500 |  | 592,621 |
| Going concern | 2,505,283 |  | 1,923,000 |
| Total (December 31, 1924) | $22,521,861 |  | $21,749,509 |
| Additions to May 31, 1926 | 1,670,856 |  | 1,670,856 |
| Total (May 31, 1926) | $24,192,717 |  | $23,420,365 |

We agree with the Commission that there should be a substantial reduction for the going concern value item included in the total, because the Virginia company, as a separate entity, has no power to sell, little control of its business and no freedom to direct its own affairs. Another relevant fact in such a study is the book cost or the invested capital. The property of the Virginia company has cost—

| | |
|---|---|
| Plant and equipment to December 31, 1924 | $18,360,225 |
| Additions to May 31, 1926 | 1,670,856 |
| Total | $20,031,081 |

At least half of this investment has been made since 1917 and during the period of high labor and construction costs. From this amount the cost of the realty, $297,925, and other property not used or useful in the public service, should be deducted, and to it should be added working capital estimated at $310,000 by the Commission, and at $575,500 by the appellant.

[23] Even if we might think that the Commission should have estimated the rate base higher, it is shown that the rates prescribed by the Commission are esti-

mated to produce more than $1,200,000 net, which is a direct return of six per cent upon a $20,000,000 investment. We think that for rate-making purposes this may be nearer to the correct figure than $19,000,000, estimated by the Commission as the rate base; but this possibility does not change our conclusion, for as we have indicated, in addition to the six per cent return upon the value of the property used and useful in the public service, the owner of its stock, the investor, the American company, apparently profits substantially by the additional benefits, service and profits received by it from or through the Virginia company. The amount or value of these benefits have not been separated or estimated. It is difficult, perhaps impossible, to do so. They are, nevertheless, substantial, and the owners of this stock, the American company, could not as successfully conduct its own interstate business, of the profits of which in this State it takes the lion's share, without the services of the Virginia company. Therefore, we conclude that in determining the rate base and the direct rate of return to its owners, all the facts to which we have alluded are relevant should be considered and given proper weight.

It is argued for the appellant company that it is unquestionably entitled to eight per cent return upon the rate base. If so, its owners have an assurance which cannot be given to any investor in private enterprises. We do not construe the decisions of the Supreme Court of the United States to afford any such guaranty. There have been many cases in which smaller returns have been held sufficient. Among them are, *Wilcox v. Consolidated Gas Co.,* 212 U. S. 48, 53 L. Ed. 382, 29 S. C. R. 192, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034; *Cedar Rapids Gas Light Co.* v. *Cedar Rapids,* 223 U. S. 655, 670, 56 L. Ed. 594, 32 S. C. R. 389; *Des*

*Moines Gas Co.* v. *Des Moines,* 238 U. S. 153, 172, 59 L. Ed. 1244, P. U. R. 1915 D, 577, 35 S. C. R. 811. Referring to the provisions of the Federal transportation act (41 Stat. 456) as to railroad earnings, Mr. Chief Justice Taft recently said: "By investment in a business dedicated to the public service, the owner must recognize that, as compared with investment in private business, he cannot expect either high or speculative dividends, but that his obligation limits him to only fair and reasonable profit." *Dayton-Goose Creek R. Co.* v. *United States,* 263 U. S. 481, 68 L. Ed. 399, 33 A. L. R. 472.

All that the Supreme Court of the United States has done, as we understand their opinions, is to decide each case upon its own peculiar facts and circumstances, to take all of the relevant facts into consideration, then in some cases to indicate its views as to a proper rate base in that instance; and to determine whether the specific rates fixed by a commission were, or were not, confiscatory.

In the recent case of *McArdle* v. *Indianapolis Water Co.,* Adv. Op. Sup. Ct. of U. S., December 15, 1926, page 155, 47 S. Ct. 144, 71 L. Ed., this idea is thus expressed: "It is well established that values of utility properties fluctuate, and that owners must bear the decline and are entitled to the increase. The decision of this court in *Smyth* v. *Ames,* 169 U. S. 466, 547, 18 S. Ct. 418, 42 L. Ed. 819, declares that to ascertain value the present as compared with the original cost of construction are among other things matters for consideration. But this does not mean that the original cost or the present cost, or some figure arbitrarily chosen between these two, is to be taken as the measure. The weight to be given to such cost figures and other items or classes of evidence is to be determined in the light of the facts of the case in hand."

[24] While much is said for the appellant of the appreciation of labor and material costs at this time, little has been said about the decreasing returns upon investments. Most of the cases in which a rate of return greater than six per cent has been approved were decided since 1918 and while interest rates were high. In this case it is proved, and it is a matter of common knowledge, that the rates for money when this case was decided were rapidly approaching normal rates. They are still decreasing and corporations of sound financial credit can readily float their securities at greatly reduced rates. The high rate of return required a few years ago to attract capital to sound enterprises is no longer necessary. So that it seems to us perfectly certain that even if there were no other benefits a six per cent return upon the fair value of a property such as this is cannot be held to be confiscatory. The risk is slight because of the fact that the revenues are quite fixed and certain, and the business is one which is not greatly affected by market fluctuations. We find in this record no reason for holding as to this company that the rates prescribed will fail to yield a just and reasonable return, when all the relevant facts are accorded proper weight.

We are fully confirmed in this view by the recent case of *C. & P. Telephone Co. of Baltimore* v. *Whitman*, 3 Fed. Rep. (2 Ser.) 939, where Rose, circuit judge, says in a learned and instructive opinion, disposing of questions strikingly similar to those involved here: "In view of the relations between the Maryland and the national companies, the court cannot hold that six per cent was not a fair return."

There may be just reason for fair differences of opinion as to many of the expressions of the Commission in its opinion, and as to some of its conclusions,

relating to details, but none of these are sufficient to justify this court in reversing its order.

We are fully aware that a very much more complete discussion of the many issues in this case is possible, but we find no sufficient reason therefor. It must not be understood that we are claiming for the Virginia authorities the right to investigate or control interstate commerce. Mr. Wm. Z. Ripley, professor of economics at Harvard, in the Atlantic Monthly for December, 1926, in his article entitled "More Light and Power Too," argues that such nation-wide organizations as the American company can only be adequately supervised by the Federal government.

Without meaning to be overcritical of courts and commissions in their efforts to follow in detail valuation experts in such cases, we can fairly observe that there is danger that attempting to elucidate the many puzzling details and deductions of which the many scientific valuations are so full will ultimately only emphasize that which has been already aptly styled "limitless obfuscation."

We may not be entirely sure whether the Virginia company is not fairly entitled to some further increases, but we are sure that the evidence submitted in this case does not justify this court in granting any higher rates than the order appealed from allows. Because of the intercorporate relations of the American company with the Virginia company and the complications to which we have referred, it is impossible to tell with any precision just the amount of the returns to the owner of the Virginia company, either considered as a separate entity, or as a part of the Bell System.

The profit to the owner of the stock of the Virginia company is the return produced by the rates pre-

scribed, estimated at more than six per cent on the value, or investment, plus the additional return to this owner, the Bell System, produced by the Virginia company growing out of its subserviency to and co-operation with the American company (owner) in its business.

[25] The rates in Virginia have been raised three times in recent years—once by the Postmaster General during the period of Federal control, then by the Virginia Commission in 1920, and now again by the order appealed from. The burden of showing that the rates so fixed were unreasonable rests upon the appellant. The evidence fails to overcome the legal presumptions in favor of the rates prescribed which are here assailed. Certainly the impartial mind is left in doubt. If these matters are not relevant, and if it be true that commissions and courts can make no deductions resting on judgment, but are bound not only by the facts shown but also by the opinions and deductions of witnesses employed to establish values, and who generally become advocates; if the estimated value of such property is to be appreciated to the highest possible figure, and then rates must be prescribed which will yield the highest rate of return, we may at least pause. It was Mr. Lincoln who said in his "Divided House" speech: "If we could first know where we are, and whither we are tending, we could better judge what to do and how to do it."

The city of Lynchburg, through its attorney, filed a brief, alleging certain cross-errors, in that the Commission increased certain rates in the city of Lynchburg, claiming that these rates are fixed by irrevocable contract embodied in the original ordinance granting the company a franchise to occupy the streets of that city.

It is only necessary to say that this is the same legal

question which has been heretofore raised in this court and definitely determined against that contention in *City of Richmond* v. *C. & P. Telephone Co. of Va.*, 127 Va. 612, 105 S. E. 157; *Victoria* v. *Victoria Ice, Light and Power Co.*, 134 Va. 160, 114 S. E. 92, 28 A. L. R. 562; *Richmond* v. *Va. Ry. & Power Co.*, 141 Va. 69, 120 S. E. 353.

There is a brief filed on behalf of the League of Virginia Municipalities, and certain municipalities cooperating therewith, assigning three cross-errors. They may be thus summarized:

(1) That the Commission erred in failing to deduct from its estimated value that portion of the toll plant not used by the appellant in rendering service to the public, and in excess of what is required to render such service;

(2) That the Commission erred in allowing going concern value in excess of $336,000 (the Commission allowed $600,000); and

(3) That the Commission erred in allowing the Virginia company a rate of return in excess of six per cent.

We think it only necessary to say as to these assignments of error that they ignore the practical difficulties of itemizing such values, and of prescribing rates which will yield a precise return. They assail the order of the Commission upon substantially the same grounds urged by the appellant company—that is, they do not accord to the views of the Commission the respect which is due to them on questions which must at last rest in judgment. To ascertain value for rate-making purposes, or the rate base, in such a case, much must necessarily be left to the tribunal vested with jurisdiction. There is no reason to doubt that the Commission gave fair consideration to each of these questions, and that the value

finally deduced by the Commission was fixed in view of all of the circumstances relied upon in support of these assignments of cross-error.

The reasons urged supply no sufficient reason for revising the judgment of the Commission.

[26] Upon the whole case, we are of opinion that the rates prescribed are not confiscatory, and with the light afforded us by this record we believe that they are just and reasonable. There is nothing irrevocable, however, about such a conclusion, for such rates are never permanently fixed, but are always subject to revision. If after a fair trial they prove to be inadequate or unjust, the question can be again reopened before the Commission without difficulty.

Our conclusion, then, is to affirm the order.

*Affirmed.*