# Richmond

BOARD OF SUPERVISORS OF ARLINGTON COUNTY, ETC., V. COM-
MONWEALTH OF VIRGINIA, EX REL., THE CHESAPEAKE
AND POTOMAC TELEPHONE COMPANY OF VIRGINIA.

November 24, 1947.

Record No. 3276.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley, Buchanan
and Staples, JJ.

The opinion states the case.

*Morton L. Wallerstein* and *W. Shepherd Drewry* for the appellants.

*E. Randolph Williams, T. Justin Moore, George D. Gibson, William H. King, R. A. Van Orsdel* and *William G. Gassaway* for the appellee.

EGGLESTON, J., delivered the opinion of the court.

The Chesapeake and Potomac Telephone Company of Virginia, hereinafter called the Company, is a Virginia corporation furnishing telephone service in about one third of the geographic area of the State. It is "a transmission company," within the meaning of section 156 of the Virginia Constitution and chapters 159-160 of the Code of Virginia, and accordingly its rates for intrastate service are subject to regulation by the State Corporation Commission.

On July 31, 1926, the Commission, after a lengthy hearing, entered an order[1] granting an increase in rates to the Company. Since then the Company has been allowed no general rate increase.

On December 20, 1946, the Company filed with the Commission its application or petition for approval of revised schedules of rates, charges, rules and regulations, designed to become initially effective in this State on January 21, 1947. While some of the proposed revised rates provided for no change, or for slight decreases, the majority involved increases in the rates, charges, rules and regulations theretofore filed and effective for use by the Company.

On the date of the filing of the application the Commission entered an order, instituting and docketing a proceeding and ordering an investigation and hearing on January 13, 1947, concerning "the reasonableness and justice" of the proposed revised rates. The order required notice of a specified form to be published once in each of two successive weeks, beginning at least ten days before the hearing, in newspapers of general circulation published in the cities of Richmond, Norfolk, Roanoke, Lynchburg and Alexandria, respectively.

The prescribed notice recited the filing of the new schedules, pointed out that the "changes generally involve increases in the rates presently existing," and gave notice

---

[1] Affirmed in *Chesapeake, etc., Tel. Co.* v. *Commonwealth*, 147 Va. 43, 136 S. E. 575.

that a hearing would be held at the appointed time, at the courtroom of the Commission, at which "members of the public generally" might "appear and present such relevant data as may be desired and be heard." The notice further provided that the new schedules showing the proposed changes in existing rates, charges, etc., were on file with and might be seen at the office of the Commission, and that information as to such changes might also be obtained from any business office of the Company.

After the required publication of this notice in the specified newspapers[2] the matter came on for hearing. The Board of Supervisors of Arlington county and others from that area appeared as intervenors in the proceeding and as objectors to the proposed revised rates. While they freely cross-examined the Company's witnesses, the intervenors introduced no evidence of their own.

At the conclusion of the evidence offered by the Company, a single spokesman on behalf of the Communist Party of Virginia read a prepared statement objecting to the proposed increase in rates.

The Company presented three witnesses who supplemented their verbal testimony by a number of illuminating exhibits and charts. Arthur L. Lambdin, vice-president and general manager, testified as to the current situation with which the Company was faced from the management point of view. Robert W. Michie, vice-president, testified as to the financial statement and earning situation of the Company. Arthur W. Harrison, general commercial manager, testified with respect to the current and proposed schedules of rates and charges.

The testimony of these witnesses may be summarized thus:

The Company operates in the State 108 central offices in 93 exchanges or zones, which serve about 401,000 tele-

---

[2] The Company filed certificates showing that the notice had been voluntarily published by it in three additional newspapers published in the cities of Danville, Staunton and Winchester.

phones. It has 6,900 employees and an investment of approximately $80,000,000 in its plant and equipment.

Since the entry of the order of the Commission in 1926, fixing the rates and charges of the Company, very decided and definite changes have taken place in its operations. The normal growth of such operations was greatly stimulated by conditions which prevailed during the period of World War II. For instance, during the period between 1939, the last normal prewar year, to 1946, both inclusive, the business of the Company has undergone the following changes:

(1) Number of telephones in service increased from 213,100 to 401,000, or an increase of........ 88%

(2) Number of toll messages increased from 8,680,-000 to 24,938,000, or an increase of........... 187%

(3) Gross operating revenues increased from $10,-700,000 to $27,400,000, or an increase of...... 157%

(4) Operating expenses (excluding taxes) increased from $7,000,000 to $22,600,000, or an increase of 221%

(5) Labor expenses (including both wage increases and increase in number of employees) increased from $3,744,000 to $14,894,000, or an increase of 295%

(6) Total investment in Company's plant has increased from $42,000,000 to $80,000,000, or an increase of ............................. 90.4%

As might have been expected, these rapid changes had a marked effect on the Company's net earnings. An increase of 157% in total operating revenues was overcome by the 221% increase in total operating expenses, with the result that the net earnings in actual dollars were 7% less in 1946 than in 1939.

Taking into account the increase from $42,000,000 to $80,000,000, in its total plant valuation during the period, the ratio of net earnings to the total investment, or the rate of return, decreased 51%, or to one-half the 1939 level.

In other words, although the Company had, in 1946,

almost twice the amount invested in its plant as it had in 1939, and was doing two and one-half times as much business, yet due to increased cost of labor and other expenses its net earnings were actually less and its rate of return was reduced by more than one-half. The testimony is that on its intrastate operations—the subject of this proceeding—the rate of return for the year 1946 was 2.68% of the average original cost of the Company's plant, plus working capital,[3] less depreciation reserves.[4]

Although the Company made large additions to its plant during the war, scarcities of materials and labor made it impossible to keep up with the growth and demand for service. The average annual net increase in telephones during the pre-war period of 1936-1940 was 16,000. This increased to 23,000 during the war period of 1941-1945. In 1946 the increase was over 52,000, far greater than in any previous year.

In order to meet this demand, the witnesses on behalf of the Company estimated that its construction needs would require the expenditure of $15,000,000 in 1947, and a total of $60,000,000 for the next five years.

As summarized by Mr. Michie: "With a critically low level of its earnings, the Company must now seek rate relief in order to maintain its financial integrity and to go forward with" this "program of expansion."

The Company's witnesses testified, and the Commission found, that the effect of the proposed revised schedules of rates and charges would increase the gross annual operating revenues of the Company, from its intrastate business, by 10%, or $2,709,000. This latter figure, it was pointed out, is about $700,000 short of the actual wage increase of $3,400,000 made since April 1, 1945, and is slightly more than one-half of the general wage increases made since 1939.

---

[3] This amount of working capital equals one month's operating expenses, other than taxes and depreciation.

[4] Depreciation actually recorded in accordance with the accounting requirements of the Commission.

It was further shown that the proposed schedules would effect an estimated increase in the annual net earnings of the Company, from its intrastate business, of $1,570,409.

By reason of such increases it was estimated that the net intrastate earnings would be equivalent to 5.66% per annum on the average original cost of the intrastate plant, plus working capital, less depreciation reserves, amounting to $52,641,759.

Upon consideration of the evidence adduced the Commission entered an order holding that the proposed schedules of rates, charges, rules and regulations were "not unjust or unreasonable," and that in accordance with the prayer of the Company they should be put into effect.

The Commission's reasons for this conclusion were embodied in an elaborate written opinion which fully discusses the evidence and all other questions involved. Lack of space forbids an abstract of the opinion. Suffice it here to say that the Commision found that, "taking into consideration the high prices prevailing as of today, we are of the opinion that the one basis of valuation used by the Company throughout this case, viz., average original cost, less depreciation reserves,[5] plus working capital,"[6] of its intrastate plant, fixed by the evidence at $52,641,759, "is among the lowest, if not the lowest, elements to be taken into consideration in determining the fair value or rate base," and that the proposed increase in rates, estimated to yield an annual return of 5.66% on such valuation, was not "unjust and unreasonable."

The Commission also found that the rate increases were justified by the rapidly mounting operating costs with which the Company had been faced. As it said: "A publicly regulated monopoly is helpless in times of rapidly mounting costs unless it is given relief by the regulating authority. * * * The manufacturer and the merchant, when prices for raw material, or supplies, or rent, go up, simply charges

[5] See Note 4.
[6] See Note 3.

his customer a larger amount. He can do nothing else. The utility cannot do this without the consent of the Commonwealth through its constitutionally appointed agent, the State Corporation Commission."

From the order of the Commission the Board of Supervisors of Arlington county and the Arlington Public Utility Commission, two of the intervenors below, have appealed. There are numerous assignments of error which may be logically grouped thus: (1) Objections to the course of procedure; (2) The alleged failure of the Commission to consider certain factors pertinent to rate inquiries; and (3) The alleged injustice, unreasonableness and discriminatory nature of the proposed schedule of rates, charges, etc., as affecting telephone subscribers and users in the Arlington county area.

First, as to the course of procedure. Complaint is made of the action of the Commission in not granting the intervenors' motion for a thirty days' continuance.

There was no claim or suggestion that the intervenors desired further time within which to collect or produce evidence in their behalf. The sole stated basis for the requested postponement was that more time was desired "to study the proposed rate increasse."

In denying the motion the Commission pointed out that the published notice of the hearing, which the representative of the intervenors admitted he had seen, disclosed that schedules of the proposed rates, charges, etc., were on file with the Commission and were open to inspection. No reason was assigned why these were not studied in advance of the hearing.

Clearly, in this situation, the refusal to grant a continuance was within the judicial discretion of the Commission.

Next, it is said that in seeking relief the Company should have followed the Act of 1934, ch. 246, p. 365 (Michie's Code of 1942, Section 4071a), rather than Code, Section

4066, as amended by Acts 1924, ch. 375, p. 538, Acts 1927, Ex. Sess., ch. 36, p. 123.

■ There is no merit in this contention. The statute first-mentioned applies to an application for temporary relief. It permits the Commission, "pending an investigation" of a proposed increase or reduction in rates of a public utility, to "enter a temporary order * * * fixing a temporary schedule of rates" while it is considering what disposition is to be made of the matter.

In the case before us no question of temporary rates was involved. The application sought, and the Commission's order granted, a rate increase which remains in effect until changed or modified by the further order of the Commission. What the Company sought and obtained was *prompt* relief, not *temporary* relief.

But it is said that even if the application properly came within the purview of Code, Section 4066, as amended, no change in rates could lawfully have been made "except after thirty days' notice to the Commission, and to the public."

■ While the statute does provide that "no change shall thereafter be made in any schedule, * * * except after thirty days' notice to the Commission, and to the public," this is followed by a proviso in the same sentence "that the Commission may, in particular cases, authorize or prescribe a less time in which changes may be made."

The final complaint in this group of assignments is to the action of the Commission in allowing the Company to file after the hearing, as a part of the record, and in considering, "Exhibit B" and "Exhibit 20."

"Exhibit B" is merely a list of the newspapers in which the Company published an advertisement justifying its request for an increase in its rates.

■ While the complete list of the newspapers was not stated during the hearing, the advertisement, its contents, and the fact that it was given wide circulation were frequently referred to. It is perfectly plain that this exhibit

could have exercised no influence upon the Commission's finding.

"Exhibit 20" is a detailed list of the "revenue increase by exchanges and zones." It was furnished after the hearing upon the specific request of the then counsel for one of the intervenors.

A large portion of the appellants' brief is devoted to a discussion of numerous factors usually considered in rate cases, as to which, it is said, there was no evidence introduced before the Commission, and without which, it is claimed, the Commission was not justified in reaching its conclusion. Among these factors are: "The probable rate of return on investments or on money market at the present or probable near future;" "The relationship of the Chesapeake and Potomac Telephone Company of Virginia with the American Telephone and Telegraph Company and its subsidiaries;" "The effect of abnormal conditions at the present or in the near future in relation to income, excess profits and other taxes;" "What is maintenance, what is investment and as to the future of both;" "Proper allocations as between interstate and intrastate revenues and expenses;" "Details of wage increase adjustments;" "Explanation of the sudden drop in toll revenues in Virginia as compared to other States;" "Going concern value;" "Property values, used and usable, or property purchased, unused and withheld for future use."

But as the Commission pointed out in its opinion, this was not the usual or typical utility rate case with which it frequently deals. Ordinarily, in seeking a rate increase the utility undertakes to establish a higher valuation of its property and plant as the "rate base," or to show that it is entitled to a higher yield on the established base, or both.

Conversely, when there is an application to reduce rates the application undertakes to establish a lower valuation of the utility's property and plant, or to show that it is entitled only to a lower yield thereon, or both.

In either of such cases it becomes proper or neces-

sary that the Commission inquire into the factors relied on here by the appellants.[7] *Chesapeake, etc., Tel. Co.* v. *Commonwealth*, 147 Va. 43, 136 S. E. 575.

The Commission had no such case before it here. The Company did not undertake to increase the value of its rate base or to seek a higher return thereon. Its application was predicated upon the original cost of its plant, less depreciation, plus a small amount of working capital, as its rate base, which the testimony showed, and the Commission held, in view of the present prevailing high cost of construction, was "among the lowest, if not the lowest, elements to be taken into consideration in determining the fair value or rate base."

Obviously, then, any reasonable figure for the present fair value of the Company's plant and property will be higher than the original cost, less depreciation. Had the Commission considered certain of the factors mentioned by the appellants the value of the rate base might have been increased. It would not have been decreased.

As has been said, the evidence showed, and the Commission found, that the proposed rate increase would yield a return of 5.66% on this rate base, and that such a return "is not unjust or unreasonable."

We cannot say that such conclusion is wrong. It is amply supported by the evidence, and, under the Constitution (Section 156, (f) ), the Commission's findings in such matters come to us "as *prima facie* just, reasonable and correct."

Moreover, as has been said, the evidence shows that the proposed revised schedules of rates and charges will increase the gross annual operating revenues of the Company from its intrastate business by about 10%, or $2,709,000, which is but a small proportion of the wage increase alone which the Company has recently sustained.

Therefore, whether the 10% increase in revenues

[7] As a mater of fact, several of these detailed factors were considered and discussed in the Commission's opinion.

be viewed either as a fair rate return on a proper rate base, or as an offset to the increased cost of operation, it was, we think, within the "range of legislative discretion" of the Commission. *Chesapeake, etc., Tel. Co.* v. *Commonwealth, supra* (147 Va., at page 57); *Norfolk, etc., R. Co.* v. *Commonwealth,* 162 Va. 314, 324, 174 S. E. 85.

Finally, it is said that the proposed schedules of rates, charges, etc., are unjust, unreasonable and discriminatory in their application to the telephone subscribers and users in the Arlington area. The basis of this contention is that in this area the new rates involve greater percentage increases over the 1926 schedules than those in most other places in the State.

As a corollary to this contention the claim is made that the Commission should have required that the plant values, operating revenues, operating expenses, etc., in the Arlington-Alexandria area be segregated to that locality, and that a fair rate be fixed for this part of the State as a unit.

We think the Commission's opinion properly answers this latter contention. It said: "This Commission many years ago adopted, and has used, the integrated state-wide basis of telephone rate making whereby the total intrastate operations form the unit for rate making and determination of over-all revenue requirements. It has always fixed the rates on a state-wide basis, with the exchanges classified generally as to the number of stations connected to and served by the various exchanges. The overwhelming majority of other state commissions, with telephone regulatory powers, has also adopted the state-wide basis."

Consequently, it concluded: "We can see no reason for attempting to segregate the Alexandria-Arlington area and charge rates there different from the rates charged elsewhere in Virginia for comparable amounts of service."

It is true that under the new schedules the rates in the Alexandria-Arlington area are increased more than those

in some other sections. For instance, in Arlington county, whose business is handled through the Oxford exchange, the flat residence monthly rates are increased from $2.75 to $3.75, or 32%, and the flat business monthly rate from $4.00 to $8.00, or 100%, while in certain other localities—such as Staunton, for example—there has been little or no change in the rates for similar service.

Mr. Harrison, the Company's general commercial manager, testified that the basic value of telephone service is measured by the extent of the communication it makes possible, that is, by the number of other telephones in a particular locality which can be reached without additional charge. As the number of telephones in an area increases, the value of the service increases, and the rate should increase correspondingly.

Consequently, in fixing rates, telephone users are segregated into groups. Subscribers having access to 900 or less telephones pay one rate, those between 900 and 1800 a higher rate, and so on until those who have access to 50,000 telephones or more pay the highest rate.

The cities of Richmond and Norfolk, for instance, fall within the last class, both under the 1926 schedules and under the proposed new schedules.

At the time of the 1926 classification the Oxford zone, in the Arlington area, had 3,207 telephones. During the intervening twenty years Arlington county, due to its proximity to the city of Washington, has undergone a tremendous change. It has ceased to be a rural community and has become an urban community. With this change the number of telephones in the Oxford zone has increased from 3,207 to 37,215, or 1,060%.

Likewise, in the Alexandria-Arlington area the total number of telephones have increased from 25,261 in 1939 to 79,336 as of December 31, 1946. In fact, as of the date last-mentioned, the total number of telephones in this area (which, however is divided into several zones or ex-

changes) exceed those in both the Richmond and Norfolk areas[8] where the highest rates obtain.

It is clearly manifest, then, that recently under the 1926 schedules of rates the telephone users in the Alexandria-Arlington area have enjoyed a preferential rate at the expense of users throughout the State.

But that is not all. The evidence shows, and the Commission found, that the new rates for the Arlington area are lower in most instances than those fixed in the 1926 schedules for exchanges with a similar number of telephones as are now available to those subscribers. Hence, these users are better off under the new schedules than they would have been had the 1926 rate schedules been applied to them.

Indeed, the Commission found that "the new group classifications are definitely much better than the old classifications." Consequently, the Commission held that the new schedules were not unjust, unreasonable or discriminatory in their application to the users in the Arlington area. We agree with this conclusion.

The order of the Commission is

*Affirmed.*

---

[8] Richmond has 79,061 and Norfolk 72,131 telephones in their respective flat rate calling areas.