Public Service Commission, Feb. 12, 1948. } No. 3728.

NEW ENGLAND TELEPHONE & TELEGRAPH COMPANY *v.* STATE.

*Sulloway, Piper, Jones, Hollis & Godfrey,* and *T. Baxter Milne* and *Robert H. Montgomery* of Massachusetts (*Mr. Hollis* orally), for the plaintiff.

*Ernest R. D'Amours,* Attorney General, for the State and the Public Service Commission.

BRANCH, C. J.   The finding of the commission that no emergency exists cannot be sustained and must be vacated.

After twenty years of operation under rates fixed by the commission in 1926, the company found itself confronted in 1946 with a company-wide loss of $369,000 which was more than accounted for by a loss of $769,000 on its New Hampshire operations.   There has been no catastrophe or change in business methods or procedures to account for such losses, and the company contends that the above losses have been due to the widespread fundamental changes in economic conditions which have taken place since the present rates were fixed in 1926, and especially since the end of World War II.   This cause for the company's difficulties was given at least partial recognition by the commission by its finding upon the company's petition next referred to that "primarily its financial trouble at the present time flows from increases in wages granted to its employees. . . . No claim, however, has been advanced that the company has been over generous

to its employees. . . . No clear pattern is discernible in the evidence before us except that the telephone company is caught in the pattern of wage increases sweeping the country." These losses were continued in 1947 and for the first ten months of that year showed a company-wide loss of $644,000 and a loss on New Hampshire operations of $745,000.

In view of the then existing situation, the company filed, upon December 3, 1946, a new schedule of rates estimated to produce a revenue of $1,068,000 for the calendar year of 1947. In December 1946, the commission suspended the effective date of the proposed rates pending a commission investigation and decision thereon, and on July 28, 1947, granted a temporary increase of 10% in rates, which has proved wholly inadequate. 29 N. H. P. S. C. 163. The investigation is still in progress and no date for its conclusion has, or can be, set. At present the company shows a continuing operating loss of more than $40,000 per month, and it is claimed that such losses have impaired the credit of the company to such an extent that it can no longer sell its stock at par and it cannot legally sell it for less. Accordingly the company has been forced to raise money for improvements and extensions of its services by the sale of debenture bonds in the sum of $40,000,000. It now requests approval of a rate schedule to yield additional revenue of $1,680,000.

Under these circumstances we do not think that the present situation of the company can be regarded as anything but an emergency of the precise kind contemplated by the statute, which calls for prompt emergency relief. The present situation of the company is fully as acute as that recognized by the commission in Case D-T 2690, *Re: Intrastate Railroad Rates*, 29 N. H. P. S. C. 271, where the commission said that the evidence before it indicated that "a financial emergency exists, due to a substantial increase in costs of railroad service through recent non-operating labor awards and costs of materials including fuel," and further, that "said interim increase is required to permit the railroads operating in this state to provide adequate and efficient transportation service, and to maintain their financial condition upon a reasonably sound basis." The difficult position of the company was indicated by the Supreme Court of Virginia in *Arlington County* v. *Commonwealth*, 45 S. E. (2d) 145, 148, 149, as follows: " 'A publicly regulated monopoly is helpless in times of rapidly mounting costs unless it is given relief by the regulating authority. . . . The manufacturer and the merchant, when the prices for raw materials, or supplies, or rent, go up, simply charges

his customer a larger amount. He can do nothing else. The utility cannot do this without the consent of the Commonwealth through its constitutionally appointed agent, the State Corporation Commission.' "

In its petition to the commission, the company expressed its willingness "to accept as a condition of being authorized to make effective the requested emergency rates, a requirement to furnish a bond conditioned on the repayment to New Hampshire customers of the difference, if any, between the amounts paid under said rates and the amounts which would have been paid under the rates as finally determined, and hereby formally offers to furnish such a bond in an amount and with a surety acceptable to this commission." In support of its conclusion "that we do not deem it advisable to grant authority to make emergency rates effective immediately, under bond," the commission gave two reasons as follows: "This conclusion is based, first, upon the absence of any statutory authority to promulgate rates under bond, and, second, on the fact that under Docket No. D-R 2610, this Commission is pursuing an investigation to determine the answers to questions arising out of that proceeding, having to do with the proper and reasonable rates to be charged by the petitioner." We do not consider "the absence of any statutory authority to promulgate rates under bond" an adequate reason for the denial of any emergency relief under the present circumstances. It is argued by the company that since the commission has undoubted authority to approve the proposed rates unconditionally, it necessarily has authority to approve them upon a condition. It is not necessary to decide, however, whether the commission has authority to require a bond as a condition of the approval of requested rates. The question is largely academic in view of the company's willingness to furnish such a bond, the only remaining question being the willingness of the commission to accept the proffered bond. We are of the opinion that there is nothing in the statute which precludes the acceptance of such a bond when voluntarily offered and that it should be accepted if that appears to be a reasonable way of protecting the public against the payment of rates which are subsequently adjudged to be unreasonable.

The second reason given by the majority of the commission for denying the petition for emergency relief was that "The investigation currently under way is for the purpose of ascertaining the propriety of the Company's methods and practices, . . . in order that we may be able to set rates that will on one hand, be no higher than the public

should pay, and, on the other hand, will insure to the Company sufficient revenue to furnish adequate service. Having in mind that the conclusions to be drawn from this investigation may result in either higher or lower rates, we are of the opinion that the present rate level should be maintained until the investigation is completed." The argument of the Attorney General in opposition to the present petition consisted chiefly of an elaboration of this position of the commission. In other words, it was argued that there can be no emergency relief in the present case until the investigation of the commission into the methods and practices of the company is complete. This investigation has now consumed over a year, and it is, therefore, evident that prompt emergency relief such as the situation requires has been denied to the company and will continue to be so denied if it must await the result of the commission's investigation. It is evident that such a procedure constitutes a practical repeal of R. L., c. 292, s. 10. The investigation of the commission is designed to result in permanent rates for a considerable period of time. For the purpose of establishing such rates, an investigation of the various questions posed by the commission is justified. The necessity for emergency relief, however, does not depend upon the answers to these questions but upon the immediate needs of the company, and the pendency of the investigation furnishes no ground for denying such relief. We, therefore, conclude that the right of the company to emergency relief without delay has been established.

The minimum of emergency relief to which the company is entitled is a sum which will put a stop to the continuing operating losses of the company and pay accruing interest upon the company's bonds allocated to its New Hampshire property, used here in intrastate business. Upon the revised figures submitted to us by the company the annual operating loss in New Hampshire operations is $480,000 while the company's bond interest upon the basis of property in New Hampshire is $290,000, totalling $770,000. These figures, upon the company's present methods of accounting, have not been questioned.

It is, therefore, ordered that the company's petition for emergency relief be remanded to the commission and that said commission be instructed, upon receipt of a repayment bond as above described, to grant forthwith an increase in the rates now in force sufficient to produce additional annual revenue of not less than $770,000 said rates to remain in force until the commission completes its investigation now in progress and promulgates new rates in accordance with its conclusions. The increase of $770,000 may be accomplished by a

percentage increase of the rates now in force, or by any other method deemed practical and expeditious by the commission.

The foregoing order does not take into account the claim of the company that it is entitled to a return upon the equity value of its property represented by the common stock. We do not think that, upon a petition for emergency relief such as this, the question of such return is before us, but it will be a question for the commission to consider in establishing permanent rates. Until such permanent rates can be established, stockholders must expect to share the burden of abnormal costs without transferring the whole to the public under the guise of emergency relief.

The case is remanded for further proceedings in accordance with the directions contained in this opinion.

*Remanded.*

All concurred except JOHNSTON, J., who concurred in part.

JOHNSTON, J., *concurring:* I agree with the foregoing opinion and order except that I would go further in granting relief. In my opinion the rates fixed under R. L., c. 292, s. 10, should provide for a fair return on the company's investment. The fact of the emergency does not change the objective of a reasonable return on the cost of the property of the utility used and useful in the public service less accrued depreciation. It merely means that relief is imperative. The bond that is offered provides for repayment of all excess rates so that the public suffers no loss.

ON REHEARING. After the foregoing opinion was filed, the Public Service Commission gave the matter further consideration, and upon February 16, 1948, announced its conclusions as follows:

"At a meeting held today, the majority of this Commission agreed, as instructed by the opinion of the Supreme Court in Docket 3728, filed February 12, 1948, to accept and make effective immediately, a tariff producing additional annual revenue in the approximate amount of, but not less than $770,000, said rates to remain in force until the Commission completes its investigation now in progress and promulgates new rates in accordance with the conclusions."

Thereafter the plaintiff filed in this court a motion for rehearing, alleging that the majority decision of the Public Service Commission had misconstrued our opinion and requesting clarification of the opinion.

64

PER CURIAM. The motion is occasioned by the quoted action of the commission. The propriety of the commission's action not being reviewable on motion for rehearing, the order is

*Motion denied.*