# Richmond

## Board of Supervisors of Arlington County v. Virginia Electric and Power Company.

April 25, 1955.

Record No. 4336.

Present, All the Justices.

1103

The opinion states the case.

*William J. Hassan* and *M. G. Baron*, for the appellant.

*Hunton, Williams, Gay, Moore & Powell; T. Justin Moore, Jr., George D. Gibson* and *John W. Riely*, for the appellee.

*Christian, Barton, Parker & Boyd* and *Robert T. Barton, Jr.,* amici curiae.

SPRATLEY, J., delivered the opinion of the court.

The Board of Supervisors of Arlington County appeals from a decision and order of the State Corporation Commission entered on December 30, 1953, authorizing the Virginia Electric and Power Company, a public service corporation engaged in supplying electricity for heat, light and power, to increase its rates and charges for service rendered by it in this State. National Utility Service, Inc., representing certain commercial consumers of electric energy, also filed a petition for an appeal, which it subsequently withdrew. The Board of Supervisors of Arlington County, the sole appellant, will be hereinafter referred to as the County, the Virginia Electric and Power Company as the Company, and the State Corporation Commission as the Commission.

The Company provides electric service in sixty-seven counties in Virginia, in nineteen counties in northeastern North Carolina, and five counties in eastern West Virginia. The territory comprises about two-thirds of the area of Virginia, 32,000 square miles, including many large urban areas, such as the Richmond, Hampton Roads and Alexan-

dria-Arlington areas. The areas served in North Carolina and West Virginia are predominantly rural like much of the Virginia territory. It has approximately 600,000 electric customers. The Company also distributes natural gas in the Hampton Roads area; but this proceeding concerns only its rates and charges for electric service.

## I

This proceeding was instituted October 6, 1953, when the Company filed with the Commission an application for the approval of a revised schedule of its rates and charges for electric service provided within the areas served by it in Virginia, and for the simplification of its rate schedule structure throughout its entire system. The Company alleged that its existing rates and charges failed to provide a reasonable return upon its investment, and that increased rates were necessary to enable it to efficiently operate, discharge its public duties, and market its securities on favorable terms in order to raise sums for a large continuing construction program to meet the public needs. It prayed that new rate schedules, filed as exhibits with its application, be approved as effective on successive billing dates on and after January 1, 1954.

The Company filed similar applications with the proper Commissions in North Carolina and West Virginia to put the same rates into effect within the territory served by it in those States.[1]

The Virginia Commission immediately set the Company's application for hearing on November 10, 1953. It ordered that "an investigation of the reasonableness and justness of the proposed rates and charges be entered upon," and directed publication of a notice of the hearing and service of a copy of its order on the officials of the local governing

---

[1] These applications have both been granted. North Carolina Utilities Commission, Docket No. E-22, Sub. 17, Order of June 1, 1954 (rates effective June 1, 1954); Public Service Commission of West Virginia, Case No. 3999, Order of February 26, 1954 (rates effective March 1, 1954).

bodies within the area concerned. Publication of the notice was duly had, and a copy of the order was served on the Board of Supervisors of Arlington County on October 9, 1953.

When the application of the Company came on for hearing on November 10, 1953, a number of municipalities, including Arlington County, the National Public Utility Service, Inc., the Virginia Farm Bureau Federation, the Virginia Motion Picture Theater Association, and other interested groups and individuals, appeared to oppose the proposed increase in rates.

Counsel for the objectors examined the witnesses for the Company at length. At the conclusion of the direct case for the Company on November 11th, the Commission adjourned until December 14, 1953, for further cross-examination and to enable the objectors to present such testimony as they desired. Upon the continuation of the hearing on December 14th, witnesses for the Company were further cross-examined for two days, and several witnesses testified on behalf of certain objectors.

On December 18, 1953, after hearing rebuttal testimony on behalf of the Company, the Commission announced that it would take the case under advisement. Thereupon, counsel for the Board of Supervisors of Arlington County moved for a further postponement of thirty to sixty days, so that his client might "prepare direct testimony and accompanying exhibits." The motion was overruled.

On December 30, 1953, the Commission rendered its decision in which it found the requested rate increase to be justified and reasonable, and ordered that it be put in effect as of March 1, 1954. In its order, the Commission further specifically provided as follows:

"THE COMMISSION further finds that a study should be made under the direction and supervision of the Commission of the cost of service of each of the classes or types of service rendered by the applicant under any and all of its filed and approved schedules of rates and charges in order to

determine whether any of said schedules under which applicant renders service are unjust and unreasonable and it directs the Staff of the Commission under the supervision of the Commission to make arrangements forthwith for such study.

"It Is, Therefore, Ordered:

\* \* \* \* \* \* \*

"(2) That the Staff of the Commission take immediate steps to arrange for the rate study found necessary by the Commission in this proceeding and report the results thereof to the Commission; * * *."

## II

Two written opinions were rendered, one by Commissioner Hooker, in which Commissioner King concurred, concluding that the rate base or present fair value of the Company for rate-making purposes was the net original cost investment of its property as of June 30, 1953. They determined that base to be $313,954,000 for the system as a whole, and $281,930,000 for the Virginia portion. They found that the gross revenues of the Company for the twelve months' test period ending June 30, 1953, were $76,559,058 for the entire system, and $70,072,939 for the Virginia portion. After making certain adjustments in depreciation charges and cash working capital claimed, they found the net operating income to have been $16,244,105 for the system as a whole, and $15,284,925 for Virginia, on the basis of actual geographical receipts. The rate of return was thus shown to be 5.14% for the entire system and 5.38% for Virginia. They ascertained that the requested $4,800,000 of additional gross revenues for the system as a whole would, after deduction of Federal income taxes and State and local gross receipts taxes, increase the net earnings only by $2,201,000 for the system, which ad-

ditional net increase would raise the rate of return upon the ascertained rate base to 5.87%, a rate of return which was deemed fair both to the Company and its customers. All of the Commissioners approved a simplification and consolidation of the rate schedules for the Company. Accordingly, sixty-one schedules and thirteen riders on file with the Commission were ordered to be replaced by nine schedules and four riders.

Commissioner Catterall was of the opinion that there was no necessity to fix a rate base in this case under the orthodox formula, and he disagreed with the conclusion of the majority as to the amount of the additional gross receipts needed by the Company. He filed a separate opinion setting out his views, in which he said: "I call this a concurring opinion because I concur in the opinion of the majority that the final order should not be reversed by the appellate court." He explained this by saying that the final order of the Commission constituted legislative action. Commissioner Catterall agreed that the Company was entitled to additional income. He said that in order to ascertain the proper amount of increase, it was only necessary to find out how much was required to enable the Company "to pay its expenses and make a profit sufficient to attract new capital." Employing the latter method, he arrived at a rate increase allowing additional gross receipts amounting to $3,853,000 as sufficient to accomplish the purpose desired.

### III

The County makes twenty-eight assignments of error. Many of the issues and contentions of the County intertwine and overlap. The principal objections may be grouped as follows: (1) that the Commission failed to consider all of the factors pertinent to rate inquiries; (2) that it erred in ascertaining the proper amounts to be included in the rate base of the Company, in fixing the time of the rate base, in determining its net earnings, and the fair rate of return; (3) that the proposed new rates and charges as

affecting users of electricity in the Arlington County area are unreasonable, arbitrary, and capricious; and (4) that the Commission denied the fundamental rights of the County by refusing it a continuance.

Briefly and concisely stated, the assignments of error are predicated upon the charge that evidence before the Commission as to rate base, revenues, expenses, rate of return and the relationship of particular rates did not justify the action of the Commission.

## IV

The principles which govern our consideration of this case have been stated in several former utility rate cases before this court. In performing the duty of fixing reasonable and just rates for a public service corporation providing heat, light and power service, the Commission exercises a legislative function delegated to it by the legislature of Virginia by Code, § 56-235, by virtue of § 156(c) of the Constitution of Virginia. The power delegated by the legislature has the same attributes as the power directly delegated by the Constitution to the Commission for the regulation of "transportation and transmission companies" under § 156 of the Constitution. Therefore, what we have said with reference to the latter power in *C. & P. Tel Co.* v. *Com.,* 147 Va. 43, 136 S. E. 575; *Norfolk & Western Ry. Co.* v. *Com.,* 162 Va. 314, 174 S. E. 85; *Board of Supervisors* v. *Com.,* 186 Va. 963, 45 S. E. (2d) 145; and *Norfolk* v. *C. & P. Tel. Co.,* 192 Va. 292, 64 S. E. (2d) 772, applies equally here.

In the fixing of rates deemed just and reasonable, there is a reasonably wide area in which legislative discretion is involved. Therefore, a rate of return allowed by the Commission may not be changed or set aside as unfair or unjust unless there appears an abuse of legislative discretion. 192 Va., *supra,* at page 300.

The capacity in which we review this proceeding is made quite clear by subsections (f) and (g) of § 156 of the Constitution.

Section 156 (f) of the Constitution of Virginia provides:

"The appellate court shall have jurisdiction, on such appeal, to consider and determine the reasonableness and justness of the action of the Commission appealed from, as well as any other matter arising under such appeal; provided, however, that *the action of the Commission appealed from shall be regarded as prima facie just, reasonable and correct,* but the court may, when it deems necessary in the interest of justice, remand to the Commission any case pending on appeal, and require the same to be further investigated by the Commission, and report their opinion to the court (together with a certificate of such additional evidence as may be tendered before the Commission by any party in interest) before the appeal is finally decided." (Italics added)

Subsection (g) of § 156 provides:

"Whenever the court, upon appeal, shall reverse an order of the Commission affecting the rates, charges or the classification of traffic of any transportation or transmission company, it shall at the same time, substitute therefor such order as in its opinion the Commission should have made at the time of entering the order appealed from, otherwise the reversal shall not be valid. Such substituted order shall have the same force and effect (and none other) as if it had been entered by the Commission at the time the original order appealed from was entered."

The above provisions of the Constitution make it clear that in the first instance, the finding appealed from must be regarded "as prima facie just, reasonable and correct," and that upon appeal we, in the second instance, judicially review the proceeding. We cannot disturb the finding of the Commission unless the evidence shows that it was unwarranted. "We do not sit as a board of revision to substitute our judgment for that of the legislature, or of the Commission lawfully constituted by it, as to matters within the province of either." *C. & P. Tel. Co.* v. *Com., supra,* 147 Va. at page 57.

██ As Mr. Justice Miller said in *Norfolk* v. *C. & P. Tel.*

*Co.*, 192 Va. *supra*, at page 301: "Upon undertaking to fix rates for a public utility company of this character, the Commission must necessarily first ascertain (a) the value of the Company's property used and useful in the rendition of its intrastate service, (b) its annual gross revenues, and (c) its annual operating expenses. Upon accomplishing these objectives, it must then determine upon and set the percentage rate of return at such a figure as will afford the utility reasonable opportunity to earn a fair and just return on its investment."

In the performance of its duty the majority of the Commission in ascertaining a rate base adhered to the original net cost investment theory in making their valuations of the Company's property. All of the Commissioners rejected the evidence offered by the Company as to reproduction cost, despite the objection of the Company. The method adopted by the Commission was the same as that employed in *Norfolk* v. *C. & P. Tel. Co., supra.* It is predicated upon the net original cost of plant and property, less depreciation, plus a proper allowance for working capital. Such a base is "among the lowest, if not the lowest, elements to be taken in consideration in determining the fair value or rate base." *Board of Supervisors of Arlington County* v. *Com.*, 186 Va. page 975.

## V

The Company presented six witnesses who supplemented their verbal testimony by informative charts, graphs, statements, and other exhibits.

Jack G. Holtzclaw, President of the Company, testified in detail as to the history of the Company, its operations, its future prospects, its rate structure, and need for rate relief.

S. E. Ratcliffe, Treasurer, presented financial and statistical information, furnishing balance sheets for the years 1946 through 1952, and income statements for the fiscal periods ending in those years. The twelve-month period ending June 30, 1953, was selected as the test period. The actual

revenues and expenses for that period were shown. The rate base consisted of electric plant, and plant acquisition adjustment as of June 30, 1953, less depreciation and amortization reserves, plus actual materials and supplies and an allowance for cash working capital. The allowance for the latter was computed on the basis of one-sixth of actual operating expenses and donations. The results showed a level rate of return of 5.05% for the system as a whole and 5.30% for the Virginia portion of the system for the selected test period, the twelve months ending June 30, 1953.

Ratcliffe then said that additional gross revenues of $4,-800,000 were sought, of which $4,426,000 would be applicable to Virginia, and that if such additional revenues had been received during the test period the system rate of return would have been 5.75% and the Virginia rate of return 6.02%. He pointed out the necessity of using an end of period rate base.

Stuart F. Kosters, an expert valuation engineer, testified in detail as to an allocation of the Company's property and expenses between Virginia and outside Virginia. His computation showed the percentage of the rate base property located in Virginia, the percentage of revenues in Virginia, and percentage of operating expenses and allowances.

D. C. Barnes, Chairman of the Board of the Company, and its chief executive officer, testified in detail as to the securities issued by the Company, the return earned on its capital investment, its future financial requirements, and the need for additional earnings.

Tom D. Fulford, Vice-President, presented the new rates, discussed the Company's rate history, and pointed to the necessity for a complete rate revision and schedule simplification.

Dr. Ralph E. Badger, an experienced and independent investment expert, testified as to the proper rate of return for the Company. He concluded that the minimum annual earnings requirements of the Company were $20,884,000, with a rate of return of between 6.25% and 6.30%, on a

net original cost rate base. His testimony with reference to reproduction costs was rejected.

Lloyd W. Reynolds, an engineer in the public utility consultant field, and an employee of the National Utility Service, Inc., testified at some length, particularly in opposition to the amount of the new rates proposed for commercial customers.

Witnesses representing themselves or interested organizations testified that the proposed new rates were discriminatory and would have an adverse effect on the individuals and groups they represented. The objections were addressed more to the amount of the increase and to the alleged arbitrary classification in the schedules for different consumers than to the necessity for an increase.

Next came James H. Brown, chief accountant of the Commission, who testified that he and six or seven members of his staff of accountants had, over a period of two months, made a detailed examination of the Company's books and reviewed and studied the testimony and exhibits filed by the Company, which supplemented a continuous study and analysis of the Company's accounting, operational and financial condition. He found the Company kept its records and books in accordance with the "Uniform System of Accounts" prescribed by the Federal Power Commission and the State, Corporation Commission.

Brown stated specifically that he and his accounting staff had studied all plant additions and retirements; all expenditures for transmission and distribution, and general plant; had made detailed analyses of the items making up the total operating expenses during the twelve months test period; had made analyses of fuel inventories, the purchase and consumption of fuel, and expenses such as maintenance and administration costs; had reviewed and verified all taxes recorded on the Company's books, examined its computation of Federal income taxes, and the allocation of such taxes between electric and gas operations; had reviewed the Company's working papers on the estimated additional revenue

from residential customers and made various independent tests to determine their accuracy; and had also made sample studies of commercial, industrial and seasonal service. Except as to the amount proposed as allowance for cash working capital, he agreed with the results reached by the Company. He concluded that the estimate of the Company as to the annual increase in its total electric system revenues under the proposed rates was correct. He briefly characterized the scope of his staff's examination as:

"A review and consideration of the rate base components; a detailed study of the Company's operating expenses and taxes; and a verification of the additional gross revenue which it is estimated the Company would obtain, if the proposed new rates are approved by the Commission."

In addition, Brown said that, on November 12, 1953, he and several members of his staff consulted three members of the faculty of the University of Virginia, Dr. Snaveley, Chairman of the Department of Economics, Professor Charles S. Miller, Jr., Dean of the Electrical Engineering Department, and Professor Frederick T. Moss, also of the Electrical Engineering Department, requesting them to make an engineering study of this case from the record and the testimony of the witnesses, and was advised by them on December 8th, after their studies had been completed, that the case had been fully developed from economic and engineering standpoints, and the Commission had before it the essential facts upon which to base a fair and equitable decision.

## VI

The testimony of witnesses on behalf of the Company may be summarized thus:

The territory served by the Company has had a large growth in the past thirty years. While it confined its service in the beginning only to the larger municipalities and the areas around them, it has, as demand increased, spread out to the smaller towns and rural areas, so that now electric service is available to nearly all of the farms and homes in

its territory. In 1944, Virginia Public Service Company, then serving an area of Virginia, larger than the Company's Virginia area, was merged into the Company. In 1949, the Company acquired the properties of the East Coast Electric Company, serving rural areas in eastern Virginia. The number of customers of the Company increased from 100,000 in 1926 to 600,000 in 1953.

In its tremendous growth since 1945, the Company has added about 30,000 customers each subsequent year. Kilowatt hour sales and revenues have doubled; but the rate per kilowatt hour for residential service has substantially declined. Expansion of the Company has required the construction of many new facilities to render electric service. Its investment in electric plant has increased from $136,000,000 on December 31, 1946, to $345,000,000 by June 30, 1953. Production plant required for the generation of electric energy grew from a net capability of 427,000 kw. at the end of 1946 to 960,000 kw., with an additional 105,000 kw. available from the Southeastern Power Administration's Kerr Dam. Transmission, distribution, and general plant accounts, reinforced by major interconnections with adjacent utilities have grown accordingly. Additional investment has required the issuance and sale of $173,500,000 of new securities.

The officials of the Company estimated that for the five years, 1953-7, it will be required to spend $200,000,000 for the construction of additional facilities, and this will require the acquisition of $100,000,000 or more through the sale of securities. The unit cost of building utility plants has risen 100% since the end of World War II. Cost of operation, including labor, materials and the purchase of coal has likewise made substantial advances. It was shown that although revenues have increased 100% in the seven years, investment has increased 154%, and that the additional post war investment has earned the return of only 4.11% The overall rate of return on the net original cost investment base was 6.07% in 1947; but declined to 5.07% in 1952, and to 5.05% for the

twelve months ended June 30, 1953 on the system as a whole.

The rates of the Company have not been generally increased for more than thirty years. On the other hand, since 1921 there have been fifty reductions and adjustments in the rate schedules for electric service, which amounted to reductions in revenue on an annual basis computed as of the dates when they were made of $8,700,000.

In the meantime, the rate structure of the Company had became complex. In 1953 services were rendered pursuant to sixty-four rate schedules and fourteen riders, largely on account of the merger of the Virginia Public Service Company and the acquisition of the East Coast Electric Company. Reductions in rates were instituted in the areas formerly served by the latter two companies; but at the time of the hearing many complexities remained. Rates were often different in different geographical areas; some schedules were available only to the customers receiving service prior to a specified time; some schedules had escalator clauses, raising and lowering the rate with the cost of coal, while others had no fuel clauses.

Officials of the Company testified that uniform system rates were desirable; that it sought to have its customers pay the same rate for the same kind and class of services no matter where located; that it was substantially impossible to compute costs for individual customers; and that broad reasons of economic, social and public policy demanded uniformity. They further testified that their present rate of return was too low, if the Company was to continue to have earnings high enough to attract additional capital investment in competitive capital markets. It was estimated that the additional net earnings required were about $2,200,000, and that to produce this amount of earnings, when effect was given to Federal income and other taxes, $4,800,000 of additional system gross revenues would be required.

The Company requested a simplification of rate schedules, proposing nine new schedules and four riders in place

of the schedules existing, and the correction of inequalities resulting from the operation of the fuel clause applicable to some customers and not applicable to others.

The objectors contended that the proposed rates were arbitrary and discriminatory as to particular classes of customers, and not based upon a proper cost-of-study service.

## VII

■ The opinion of the Commission by Commissioner Hooker shows that a full, careful and painstaking consideration was given to the evidence and the contentions of all the parties who appeared and participated in the hearing. It discusses and disposes of all the issues raised by Arlington County before the Commission.

After reducing the depreciation expense of the Company in the sum of $280,000 and adjusting the allowance claimed for working capital by one-third, the Commission arrived at a rate base of $313,954,000 for the system as a whole, and $281,930,000 for the Virginia portion of the system. Included in this figure was an amount representing plant acquisition adjustments, less reserve for amortization of such adjustments, an amount which had been theretofore determined by the Federal Power Commission[2] and the State Corporation Commission as "paid at arms" length bargaining and constituted prudent investment on the part of the purchasers." The amount represents sums paid by the Company for utility plant in excess of the original cost of such plant when it was first devoted to public use. It is being amortized by charges against income over a period of years. This is in accord with the rule adopted by other utility regulatory commissions, *Re Pacific Gas & Electric Co.*, (Cal. P. U. C. 1952) 96 P. U. R. (N. S.) 493, 506; *National Forge and Ordnance Co.* v. *Pennsylvania Electric Co.*, (Pa. P. U. C. 1953) 99 P. U. R. (N. S.) 161, 174, 175.

[2] In the matter of Virginia Public Service Company, F. P. C., Docket No. IT-5878, April 18, 1944; In the Matter of Virginia Electric and Power Company and East Coast Electric Company, F. P. C., Docket No. E-6248, December 13, 1949.

In the rate base there was included, without objection, $9,290,837 for materials and supplies actually on hand June 30, 1953. The Company also sought an allowance of $6,-703,206 for cash working capital. That was reduced by the Commission to $4,460,000, an amount equal to forty days operating expenses for the system as a whole. The Commission was of opinion that the above allowance could not be offset by accrued and deferred Federal income taxes and customers' deposits because such funds were not all available to the Company for working capital purposes.

 Next there was considered the level of earnings. There was no dispute as to the gross revenues of the Company for the test period ended June 30, 1953. They were $76,559,058 for the entire system and $70,072,939 for the Virginia portion determined on the basis of actual geographical receipts. There was also little opposition at the hearing to the expenses shown by the Company. The County contended that the amount included for amortization of plant acquisition adjustment was improper. The Commission included, as a proper charge, this expense just as it allowed the net amount in the property acquisition adjustment account to be included in the rate base and for the same reasons. It was also claimed that charitable donations should not have been deducted before determining net income. As Commissioner Hooker said, it can not be overlooked that utilities are expected to make reasonable charitable donations, because a refusal might bring on the loss of the good will of the community it serves, while other businesses make donations for worthy causes. The amount allowed was only $76,876, which was not of any significance in determining the net income in this case.

The Commission found no merit in the contention that expenses should be reduced because of savings to be anticipated from bi-monthly billings, and the expectation that Federal income taxes would be reduced from 52% to 47% as of April 1, 1954. It found both contentions to be speculative. The savings from bi-monthly billing were

unsubstantial and most had been already realized. The speculative nature of Federal income tax deduction is proved by the fact that the Congress of the United States has already provided by law an extension of the 52% rate. (P. L. 591, 83d Congress, 2d Session, Sec. 11).

[5] In determining what was a proper and reasonable rate of return for the Company, in the light of the evidence before it, the Commission followed the standard set and stated many times by the courts.

In *United Railways & Electric Co.* v. *West*, 280 U. S. 234, 251, 252, 50 S. Ct. 123, 74 L. ed. 390, 409, this was said:

"It is manifest that just compensation for a utility, requiring for efficient public service skillful and prudent management as well as use of the plant, and whose rates are subject to public regulation, is more than current interest on mere investment. Sound business management requires that after paying all expenses of operation, setting aside the necessary sums for depreciation, payment of interest and reasonable dividends, there should still remain something to be passed to the surplus account; and a rate of return which does not admit of that being done is not sufficient to assure confidence in the financial soundness of the utility to maintain its credit and enable it to raise money necessary for the proper discharge of its public duties."

In *Petersburg Gas Co.* v. *Petersburg*, 132 Va. 82, 110 S. E. 533, we said:

"The rate of return on such 'fair value' which the utility company should be allowed to receive should be fair and just to the company and such as will make its securities attractive to investors when the company is prudently and carefully operated."

In *Petition of Public Service Coordinated Transport*, 5 N. J. 196, 74 A. (2d) 580, 595, Chief Justice Vanderbilt, in considering the duty and power of the Board of Public Utility Commissioners of New Jersey, in a rate case, said:

"The chief power of this Court in rate cases is to review

the reasonableness of the rates fixed by the Board. We can say, however, that the rate which a public utility may reasonably charge should be sufficient to encourage good management and furnish a reward for efficiency, to enable the utility, under efficient and economical operation, to maintain and support its credit; and to enable it to raise money necessary for the proper discharge of its public duties. It can never be more than the reasonable worth of the service supplied; neither can it be fixed so low as to be confiscatory. If within these limits and supported by competent evidence, rates set by the Board would clearly be just and reasonable."

The objectors to the increase presented no substantial evidence as to a proper rate of return. As Commissioner Hooker said: "A fair rate of return can never be established by a rule of thumb. It requires in our opinion, a consideration of all evidence of record and a conclusion based on the evidence and on judgment and experience."

In reviewing the rates proposed by the Company, the Commission said that it found them "logical extensions of basic rates that have stood the test of time for many years." It approved uniform commercial rates for commercial and industrial consumers in schedules containing a fuel clause.

The Commission then found that the new rates proposed by the Company would have produced $4,800,000 of additional gross revenues for the system as a whole if they had been in effect during the test period adopted, and that subject to Federal income taxes and State and local gross receipts taxes, the net earnings would have been about $2,201,000. It was of opinion that since the proper rate of return should be in the vicinity of 6%, the proposed rate of return was within that range and appropriate and fair both to the Company and its customers.

██ The Commission further found that simplification and reduction of the Company's schedules were desirable, so that customers in the same business, at different locations, could be served under the same rate schedule. The County objected on the grounds that rates for the Alexandria-

Arlington area should be lower because of its higher concentration of population. It offered no evidence as to cost differentials. We approved the rejection of a similar contention by the Commission in *Board of Supervisors* v. *Commonwealth*, 186 Va. 963, 976, 45 S. E. (2d) 145, a telephone rate case.

The state-wide rule adopted for telephone rate-making may be more logically applied to an electric utility. A telephone utility at least has a unit for division, an exchange. No such unit exists for the electric business. There are many gradations of telephone service conditions; but the service of electricity is the same at all places and its value cannot be distinguished. Of course, the cost of rendering service in one area differs from the cost in another, as it varies from house to house in the same area. If the unit be broken, there would be no end of rate-making. No logical line could well be drawn mile by mile through a service area. As the Commission said, "the question is inseparably bound up with questions of broad public policy."

The Commission fixed a year-end rate base in accordance with its practice in former rate cases such as this[3], rather than a rate base predicated on the net average investment for the test period. In fixing rates for the future, the use of the end-of-period rate base provides for revenue which is directly related to plant investment made and being made in a period of abnormal expansion and rising costs. Its employment is generally followed by rate regulatory commissions in other States.[4]

We agree with the Commission that an end-of-period rate base is fair and reasonable, especially under the circumstances

[3] *Petersburg Gas Co.* v. *Petersburg, supra;* C. & P. *Tel. Co.* v. *Com.,* 147 Va. 43, *supra; Alexandria Water Co.* v. *Alexandria,* 163 Va. 512, 177 S. E. 454; *Norfolk* v. *C. & P. Tel. Co.,* 192 Va. 292, *supra.*

[4] Re Florida Power Corp. 99 P. U. R. (N. S.) 129, (Fla. R. R. and P. U. C. 1953); Re Chesapeake and Potomac Telephone Co. of Baltimore City, 5 P. U. R. (3d) 161, (Md. P. S. C. 1954); National Forge & Ordnance Co. v. Pennsylvania Electric Co., 99 P. U. R. (N. S.) 161 (Pa. P. U. C. 1953); Re Cambridge Electric Light Co., 96 P. U. R. (N. S.) 77 (Mass. D. P. U. 1952).

presented here. Its use tends to offset the lag in the return of earnings during the period between the time the money is invested and the time earnings are received.

The County charges that the Commission erred in authorizing the Company to put into effect rates allowing a higher return in Virginia than it receives in other States in which it operates, and that the authorized rates are higher than those charged by the Potomac Electric Power Company for electric energy in the same area as that served by the appellee, that is, in the Arlington-Alexandria area.

We are not here concerned with rates of return allowed in other States. The question here is whether Virginia consumers of electricity are charged a fair rate. No evidence was presented showing the cost conditions under which the Potomac Electric Power Company operates. Therefore, no proper comparison may here be made with its rates.

## VIII

██ The County devoted a large portion of its briefs to the contention that no adequate cost of service study had been made by the Commission. It argued that the accounting books and records of the Company were accepted at full value without verification. This charge is not supported by the evidence. The financial condition of the Company had been under continuous study and observation of the Commission for many prior years. Items in controversy were carefully considered by the accounting staff of the Commission and by the Commission itself. The books of the Company, kept in accordance with the "Uniform System of Accounts," showed "the amount of money actually paid for property or services or the cash value at the time of the transaction of any consideration other than money," and the original cost, that is, "the cost of such property to the person first devoting it to public service." The independent examination by the Commission's staff, as testified to by James H. Brown, chief accountant, disposes of this contention.

Corollary to this contention is the attack made against the state-wide principle of rate-making, which we have already answered.

██ The County also charged that the Commission, in computing the net operating income of the Company, erred in deducting from its operating revenues an amount equivalent to income taxes deferred by reason of accelerated amortization of emergency facilities authorized by the Federal government.

In 1950, Congress enacted § 124-A of Title 26 U. S. C. A., which provides that the cost of certain facilities certified as essential to national defense may be amortized for the purpose of the determination of Federal income taxes over a five-year period rather than depreciation over their normal life. Thus, Federal income taxes are lower during the five-year period because of the enlarged deduction for depreciation or amortization. However, at the end of the five years, if tax rates remain constant, income taxes will thereafter be increased over what they would otherwise have been, and the deduction will be less. Thus, over the years there is no tax saving nor tax forgiveness; but merely a deferment in taxes. In latter years, net income will be decreased when prior allowances for depreciation and amortization have sufficed to cover the cost of the property. This question has heretofore been considered by the State Corporation Commission, and it then ·ruled that deferred taxes were to be deducted on income statements and credited to a restricted surplus account[5]. The payment of the temporary cash savings to stockholders is thereby prevented. When the same question was presented to the Federal Power Commission, as an accounting matter, by the electric and gas industries, that Commission also held that such deferred taxes should be deducted on the income statement.[6] Later the Federal

---

[5] Case No 11,347, Order dated November 26, 1952, Va. S. C. C. Rep. p. 228.

[6] In the Matter of Treatment of Federal Income Taxes as Affected by Accelerated Amortization. Opinion No. 264, Docket No. R-126 (F.P.C. December 4, 1953.)

Power Commission followed the same procedure in a formal rate case.[7]

## IX

██ Finally, the County complains of the action of the Commission in refusing to grant its motion for a postponement of the hearing. It challenges the denial as "arbitrary and capricious in law and fact," and a denial of due process of law in violation of the Constitution of Virginia and the Fourteenth Amendment of the Constitution of the United States. We find no merit in its contention. The record shows that the motion was made on December 18, 1953, two months and twelve days after the application of the Company was filed and two months and nine days after the County had notice of the hearing. The schedules of the proposed new rates and charges were on file with the Commission and were open to inspection from the time the application of the Company was filed. The County had the same opportunity to investigate and consider them in connection with the evidence and exhibits that the accounting staff of the Commission had. Nevertheless, it failed to present any evidence at the hearing, although it was represented by counsel from the beginning, and had an expert utility consultant present who declined to testify when given the opportunity.

The order of the Commission directing its staff to make an immediate study of the cost of service of each of the classes or types of service rendered by the applicant under its approved schedule of rates in order to determine whether any of those schedules were unjust or unreasonable affords protection to the customers of the Company. In view of the situation before the Commission, its refusal to grant a continuance was within its judicial discretion. *Board of Supervisors of Arlington County* v. *Commonwealth*, 186 Va. 963, 972, 45 S. E. (2d) 145.

[7] In the Matters of Panhandle Eastern Pipe Line Company, Opinion No. 269 (F. P. C. April 15, 1954) mimeograph pp. 45-9.

## X

In conclusion we reaffirm what we said in *Norfolk* v. *Chesapeake & Potomac Telephone Co., supra,* 192 Va. at page 320:

"Where, how and from what precise source or sources the increased revenue awarded is to be obtained, is primarily an administrative duty and undertaking to be exercised by the Commission. Obviously, we are not entitled to substitute our judgment in the premises for that of the Commission unless their discretion in that respect has been definitely and clearly abused."

The evidence justifies the conclusion reached by the Commission. We find no abuse of its discretion in any of the matters submitted to it, and its order of December 30, 1953, is accordingly affirmed.

*Affirmed.*